The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY, Petitioner,

v.

DISTRICT OF COLUMBIA, Respondent.

DISTRICT OF COLUMBIA, Petitioner,

v.

The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY, Respondent.

Nos. 17385–17386.

United States Court of Appeals District of Columbia Circuit.

Argued June 5, 1963.

Decided Oct. 10, 1963.

Messrs. Edmund L. Jones, Washington, D. C., and H. H. Walker Lewis, with whom Messrs. William T. Plumb, Jr. and Howard C. Anderson, Washington, D. C., were on the brief, for petitioner in No. 17,385 and respondent in No. 17,386.

Mr. Henry E. Wixon, Asst. Corp. Counsel for the District of Columbia, with whom Messrs. Chester H. Gray, Corp. Counsel, Milton D. Korman, Principal Asst. Corp. Counsel, and Robert E. McCally, Asst. Corp. Counsel, were on the brief, for petitioner in No. 17,386 and respondent in No. 17,385.

Before FAHY, WASHINGTON and MC-GOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

This matter is before us on cross-petitions for review by the taxpayer, The Chesapeake and Potomac Telephone Company, and by the District of Columbia, of a decision of the District of Columbia Tax Court with respect to certain additional assessments for 1959 under the gross receipts tax applicable to public utility companies. The taxing statute provides that " * * * each gas company, electric lighting company, and telephone company shall pay to the collector of taxes of the District of Columbia per annum 4 per centum on [its] gross receipts, from the sale of public utility commodities and services within the District of Columbia. * * *" D.C. Code § 47–1701 (1961).

The taxpayer is a New York corporation which, pursuant to franchise authority, renders telephone services to the public in the District of Columbia. It is a wholly-owned unit of the American Telephone and Telegraph Company system and, as such, is an affiliated company with The Chesapeake and Potomac Telephone Company of Maryland, and The Chesapeake and Potomac Telephone Company of Virginia, which are also wholly-owned subsidiaries of American Telephone and Telegraph Company. These latter companies supply telephone services in the Maryland and Virginia portions, respectively, of the Washington Metropolitan Exchange Area pursuant to franchises held by each under the laws of those states. Each of the three companies has property and facilities only within its franchise territory, and provides intrastate telephone service pursuant to tariffs filed with the regulatory authority in such territory. Because of the peculiarly close geographical relation of the three areas, however, and to the end of minimizing unnecessary duplication of personnel and investment in facilities, the Washington company supplies certain services to the Maryland and Virginia companies in aid of the performance by the latter of telephone service to their own customers. The payments made by the Maryland and Virginia companies to the Washington company by way of reimbursement for these aids are the subject of the additional assessments in issue here.

■ The parties have entered into a stipulation, entitled "Analysis of Assessment," which describes the utilization made by the Maryland and Virginia companies of the personnel and facilities of the Washington company. Sections A and B of that stipulation are as follows:

"A. *Payments to the Petitioner by the Maryland and Virginia Companies for activities of Petitioner's personnel rendered as follows:*

"(1) Furnishing telephone numbers to suburban subscribers in answer to their requests for such information; all information calls in the Washington Metropolitan Exchange Area are automatically routed to centralized facilities located in the District of Columbia and are handled by employees of the Washington Company.

"(2) Operation by Washington Company employees of centralized automatic message accounting equipment located in the District of Columbia and used for the purpose of obtaining the telephone numbers of subscribers placing intrastate calls from telephones in the Maryland or Virginia suburban areas to points outside the Washington Metropolitan Exchange Area.

"(3) Interception of calls directed to subscribers in the Maryland or Virginia suburban areas where the telephone numbers called have been changed, disconnected, or are incorrect; such interception and advice as to the status of such numbers being handled by Washington Company employees at special switchboard facilities located in the District of Columbia.

"(4) Operator placing and handling of calls from one point in Maryland to another point in Maryland, or from one point in Virginia to another point in Virginia, routed through facilities in the District of Columbia and handled by Washington Company employees.

"(5) Operator placing and handling of calls between Maryland subscribers, where such calls are routed through and handled at the Anacostia Central Office located in the District of Columbia.

"(6) Observation, timing, and testing of telephone calls placed by customers in the Maryland

or Virginia suburban areas; for the purpose of testing the handling of such calls by Maryland or Virginia operators, and of testing the Maryland or Virginia dial equipment, such observation, timing, and testing being done by employees of the Washington Company on a centralized basis.

"(7) Operator placing and handling of calls between Maryland subscribers, where such calls are handled at the Congress Heights Central Office located in the District of Columbia.

"B. *Payments to the Petitioner by the Maryland and Virginia Companies for Petitioner's telephone facilities used in connection with the following activities:*

"(1) Equipment in Congress Heights Central Office used in handling telephone calls between customers located in Maryland; this central office is located in the District close to the District line and nearby telephone customers in Maryland are connected to it.

"(2) Equipment in Anacostia Central Office used in handling telephone calls between customers located in Maryland; this central office is located in the District close to the District line and nearby telephone customers in Maryland are connected to it.

"(3) Telephone facilities of the Washington Company used in handling intrastate toll calls from one point in Maryland to another point in Maryland, or from one point in Virginia to another point in Virginia.

"(4) Equipment located in the District of Columbia used to automatically record data required to bill certain exchange calls and intrastate toll calls dialed by subscribers in the Maryland or Virginia suburban areas.

"(5) Facilities located in the District of Columbia and used for the purpose of translating into usable form billing data recorded on automatic message accounting tapes; this item includes payments for processing tapes of the West Virginia Company as well as the Maryland and Virginia Companies.

"(6) Switchboards and related equipment located in the District of Columbia and used in answering information calls from customers in the Maryland and Virginia suburban areas.

"(7) Telephone facilities of the Washington Company used for the purpose of establishing private lines which begin and end in Maryland, or begin and end in Virginia, but cross the District of Columbia line.

"(8) Switchboard and related equipment used in intercepting calls directed to subscribers in the Maryland or Virginia suburban areas.

"(9) Telephone plant of the Washington Company used in completing exchange calls from one point in suburban Maryland to another point in suburban Maryland, or from one point in suburban Virginia to another point in suburban Virginia.

"(10) Centralized switchboard and related equipment of the Washington Company used in connection with the activities described in paragraph (6) of A."

It will be seen that Section A relates to payments made in respect of personnel services, and Section B is concerned with

the use of facilities.[1] Under the Uniform System of Accounts prescribed by the Federal Communications Commission, and adopted by the regulatory authorities of the District of Columbia, Maryland, and Virginia, the payments received under Section A are recorded by the Washington company under Account No. 635 ("Joint Traffic Expenses-Cr.") and thus represent a credit to the expense of rendering service in the District of Columbia. The Section B reimbursements are accounted for under Account No. 524 ("Rent revenues"); these operate also to reduce the cost of service rendered by the Washington company to District of Columbia subscribers.[2]

The District taxing authorities included all of the items in Sections A and B in the additional assessment. The Tax Court in its decision excluded Items 2 and 6 in Section A, and Items 4, 5 and 10 in Section B. These are counterpart items, and the theory of the exclusion was that, in these instances, the Maryland and Virginia subscribers had no direct contact with the personnel of the Washington company. This is, to say the least, an elusive distinction, but we need not pursue it in detail for we find none of the payments in Sections A and B to be within the reach of the District gross receipts tax.[3]

I

The Washington company is subject to the net income tax of the District, and its physical properties are also subject to property taxation in the District. The tax here involved, is, thus, not in lieu of other taxation, but was enacted in 1939 as the result of an expert study of public utility taxation growing out of dis-

1. These payments are made pursuant to contracts between the Washington company, on the one side, and the Maryland and Virginia companies, on the other. These contractual undertakings are not, and are not required to be, part of any tariff filings, and represent wholly private arrangements between the parties thereto. The expenses, in relation to both personnel and facilities, are pro-rated by reference to the ratio of usage by the customers of the respective companies, and are not determined or affected in any manner by the related tariff revenues. These latter are fully retained by the company collecting them under its tariffs, and there is no pooling or division of them. This fact is to be emphasized, because it bears upon the view we take of the case.

2. It seems likely, although we do not rely on it, that these payments, for rate-making purposes, are treated by the regulatory authorities of Maryland and Virginia, respectively, as part of the cost of rendering telephone service in those jurisdictions. Each of the three jurisdictions has a gross receipts tax, and the tariff charges collected by the Maryland and Virginia companies for the intrastate services here involved are subject to tax thereunder.

3. The stipulation also contained Sections C and D, as follows:

"C. *Payments to the Petitioner for the use of its facilities by non-affiliated communications companies or common carriers:*

"Circuits, terminals, pole space and conduit space used by Western Union Telegraph Company Circuits and related equipment used by other communications companies or common carriers:

American Cable Company
Radio Corporation of America
Pennsylvania Railroad

"D. *Rental of building space to U. S. Government for housing Government P.B.X. equipment for which the Government, as a subscriber, is required to furnish space at its own expense * * *"*

These payments were also included in the additional assessments but were disallowed by the Tax Court for the reason that " * * * it is well settled that, if a public service company supplies services or facilities to another public service company in the same field, which in turn resells the services or facilities to the public, or if the services and facilities are for the sole use of the other company, they are not 'public commodities or services.'" The District has not pursued these items on appeal, although, on the theory it advances here as to Sections A and B, it is hard to see why it did not.

satisfaction with a gross earnings tax which had been in existence since 1902. The dissatisfaction, shared by both the utilities and the taxing authorities, grew in part out of the practice, upheld by this court, of including earnings from sales made by District utilities of services and supplies to other utility companies. See Potomac Electric Power Co. v. Rudolph, 58 App.D.C. 261, 29 F.2d 634 (1928), cert. denied, 278 U.S. 656, 49 S.Ct. 185, 73 L.Ed. 565 (earnings from "rent of equipment and furnishing power to related utilities"); and Potomac Electric Power Co. v. Hazen, 67 App.D.C. 161, 90 F.2d 406 (1937), cert. denied, 302 U.S. 692, 58 S.Ct. 11, 82 L.Ed. 535 (sales of electricity in Maryland).

The findings and recommendation of the "District of Columbia Tax Study" (House Document No. 108, 76th Cong., 1st Sess.), which furnished the basis for the 1939 enactment, contained this statement:

> "Present gross earnings and gross receipts taxes on the four major public utilities should be supplanted by a gross-receipts tax based exclusively on the sale of public utility services or commodities within the District of Columbia, allowing no deduction for the cost of raw materials. Deductions for sales made outside the District and for sales other than those of public utility commodities or services would be allowed. * * * "

■ The District gross receipts tax is, thus, what it purports to be—an excise tax on the privilege of furnishing franchised public utility services in the District. A subscriber in the District making a telephone call to another point in the District pays for that service at the rate fixed in a tariff filed by the Washington company under the franchise it holds from the District to provide that service. This is the service which the Washington company, as a franchised public utility, is obligated to furnish, and the revenue received from this service is clearly subject to the tax.[4]

In like fashion, the Maryland and Virginia companies render intra-state telephone service in those states under their franchises, and they—and only they— are either permitted or obligated to render that service. The charges they collect are fully subject to gross receipts taxation in those states (Md.Code Ann. Art. 81, §§ 129–134 (1957); Va.Code § 58–580 (1950)); and these statutes make no provision for remission from the tax of any sums reflecting the reimbursing payments they make to the Washington company for the assistance it provides in the rendition of that service. Under these circumstances, to allow the additional assessments here in issue would result in taxing in two jurisdictions that which is regarded as a service to consumers in but one jurisdiction.

## II

■ The nature of the assistance supplied by the Washington company can be identified adequately by reference to one of such services. Item 1 of Section A, and Item 6 of Section B, relate to the use of personnel and equipment in handling information calls by Maryland and Virginia subscribers. They operate in this fashion: If a Maryland subscriber wishes to make a call under the tariffs of the Maryland company to another point in Maryland in the Metropolitan Exchange Area, and desires first to get the telephone number from information, his request is routed to a central exchange in the District manned by personnel of the Washington company. The latter supplies the information requested, and the call is then made through the services and facilities of the Maryland company, and the tariff charge of the Maryland company is paid to it. The basic service is one which only the Maryland company is obligated to per-

---

4. The discussion here is directed to intra-District service. As we point out later, the gross receipts tax also attaches to revenues derived from interstate service furnished under tariffs filed with the Federal Communications Commission.

form. The reason why the information request is handled on a centralized basis is because the geographical relationship of the two service areas is such that it is more economical and efficient to do it this way.[5] Thus, the service may properly be regarded as performed by the Washington company for the Maryland company rather than for the individual, and the Maryland company only pays the Washington company the cost of the service. It is, in essence, the rendition by one public utility company of assistance to another in the performance of the latter's franchise obligations to its customers. As the Tax Court recognized, when a public service company supplies services or facilities to another public utility company in the same field for the sole purpose of enabling the latter company to serve its customers more efficiently, such services are not "public utility commodities or services" within the meaning of our statute, and thus are not subject to the gross receipts tax.

This, we note, was apparently also the view of the matter taken by District of Columbia taxing authorities for 20 years following the original imposition of the gross receipts tax. These cooperative practices were in effect throughout that

period, but it was not until 1959 that the effort was made to bring the reimbursing payments under the tax by the additional assessments now in issue.[6]

### III

The District of Columbia gives a very short answer to the Washington company's challenge to this late-coming enlargement of the sweep of the gross receipts tax. It has contented itself, in brief and argument, with reliance upon our decision in The Chesapeake and Potomac Telephone Company v. District of Columbia, 78 U.S.App.D.C. 53, 137 F.2d 674. This is the so-called interstate revenue case, decided in 1943, and it is advanced as completely conclusive of the issues now before us. We do not so regard it.

That case was concerned with the inclusion in gross receipts, subject to taxation, of revenues derived from interstate telephone service. But, as we trust the foregoing has made clear, we do not have before us now any question relating to revenues received under telephone tariffs of any kind. The rendition of interstate telephone service to subscribers is in no way involved. An analysis of the nature of such service will make this clear.

5. Without such centralization, the Maryland company would have to make its own investment in capital equipment and hire additional personnel to handle these requests. There would also be a lower utilization of the existing facilities of the Washington company. The cost of service of both companies would be affected, with potentially adverse rate consequences to the public.

6. The credits to expense in Account No. 635, representing the reimbursements made in respect of personnel expense, have never been included in the Washington company's gross receipts tax returns, because the District has never required the reporting of expense credits. The District has, however, always required items in all revenue accounts to be included, and the Washington company has always done so in the case of Account No. 524—the reimbursing payments in respect of facilities—treating these items as non-taxable. In one year only—1950—of the more than 20 years

since the gross receipts tax was passed, the District made an assessment by reason of these sums in Account No. 524, but this was withdrawn after the appropriate authorities analyzed the nature and source of these payments. This long-continued administrative practice, reflecting agreement with the interpretation of the statute advanced by the taxpayer here, is entitled to substantial weight. See United States v. Alabama Great So. R. R., 142 U.S. 615, 12 S.Ct. 306, 35 L. Ed. 1134 (1892), and Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933). This court has heretofore recognized the force of this principle in appropriate circumstances. Hamilton Nat'l Bank v. District of Columbia, 85 U.S.App.D.C. 109, 113, 176 F.2d 624, 628 (1949), cert. denied, 338 U.S. 891, 70 S.Ct. 241, 94 L. Ed. 547; Johnson v. Britton, 110 U.S. App.D.C. 164, 168, 290 F.2d 355, 359 (1961), cert. denied, 368 U.S. 859, 82 S. Ct. 99, 7 L.Ed.2d 56.

If a subscriber in Maryland wishes to make a call to a point in the District, he will need to use the services of both the Maryland and the Washington companies. The authority of the two companies to render this service is derived from the Federal Communications Act, and the rate is subject to regulation by the Federal Communications Commission. The service is offered by means of a tariff filed with the Commission, and both companies have joined in the filing of that tariff. A single rate is paid by the subscriber for the service, and the resulting revenue is divided between the two companies in accordance with a formula worked out between them.

It is evident, then, that in this situation the Washington company is engaged in rendering—under a tariff—a franchised public utility service in the District, and this court had no difficulty in finding that the revenue accruing to the Washington company was within the scope of the gross receipts tax. It was not being reimbursed for assistance rendered to another utility company in the performance of its obligations under an intra-state tariff. It was receiving revenue for a public utility service which it had held itself out to render to the public by means of a filed tariff.

The distinction is both substantial and critical in the discernment of what Congress intended. An analogy is provided by the treatment accorded inter-company transactions in another field. In 1941 the then Corporation Counsel of the District passed upon the applicability of the gross receipts tax to revenues realized by Potomac Electric Power Company from a sale of power generated by ·it in the District to an electric utility in Baltimore, for re-sale to the latter's customers in Maryland under its tariffs for electric services. The first sale of the surplus power was not under any tariff or pursuant to any franchise obligation undertaken by the seller. It was a voluntary effort in inter-utility cooperation which undoubtedly had beneficial rate effects for the ultimate consumer both in the District and in Maryland. We think the opinion, holding the gross receipts tax inapplicable, was sound. We believe its lesson for this case to be most instructive and we fail to grasp the Tax Court's summary disposition of it.

For these reasons, we affirm that part of the Tax Court's decision against which the District's cross-petition is directed, and reverse as to the remainder.