WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,

Potomac Electric Power Company, Apartment and Office Building Association of Metropolitan Washington, Inc., and People's Counsel of the District of Columbia, Intervenors.

PEOPLE'S COUNSEL OF the
DISTRICT OF COLUMBIA,
Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,

Washington Metropolitan Area Transit
Authority and Potomac Electric
Power Company, Intervenors.

Nos. 83–447, 83–449.

District of Columbia Court of Appeals.

Argued Nov. 22, 1983.

Decided Dec. 28, 1984.

Onkar N. Sharma, Washington, D.C., for Washington Metropolitan Area Transit Authority, petitioner in No. 83–447 and intervenor in No. 83–449.

Brian Lederer, Washington, D.C., with whom John T. Schell, Jay D. Pedelty, and Elizabeth A. Noel, Washington, D.C., were on the brief, for People's Counsel of the District of Columbia, petitioner in No. 83–449 and intervenor in No. 83–447.

Lloyd N. Moore, Jr., Washington, D.C., with whom Roberta Willis Sims, Washington, D.C., was on the brief, for respondent.

William Dana Shapiro, Washington, D.C., with whom Edward A. Caine and Mary Donn Jordan, Washington, D.C., were on the brief, for intervenor Potomac Electric Power Company. Altomease R. Kennedy and Sylvia L. Bateman, Washington, D.C., also entered appearances for intervenor Potomac Electric Power Co.

Frann G. Francis, Washington, D.C., entered an appearance for intervenor Apartment and Office Building Ass'n of Metropolitan Washington, Inc.

Before PRYOR, Chief Judge, and MACK and TERRY, Associate Judges.

TERRY, Associate Judge:

The Washington Metropolitan Area Transit Authority (WMATA) and the Office of People's Counsel (OPC) both appeal from an order by the Public Service Commission granting Potomac Electric Power Company (PEPCO) a rate increase in Formal Case No. 785. We reject all of petitioners' arguments and affirm the Commission's order.

## I. BACKGROUND

In March 1982 PEPCO filed an application with the Public Service Commission for a general rate increase of $81,080,000, later amended to $88,475,000. It also requested an additional increase of $9,290,000 to reflect a proposed change in the gross receipts tax in a bill then pending before the District of Columbia Council. After the designation of issues and the submission of exhibits and testimony, the Commission held hearings in September 1982.,

On December 21, 1982, the Commission announced its decision to grant PEPCO a base rate increase sufficient to generate an additional $34,003,000 in annual revenues. Eight days later, on December 29, the Commission issued Order No. 7716 setting forth the reasons for its decision. WMATA, PEPCO, and OPC filed applications with the Commission seeking reconsideration, all of which were denied on February 28, 1983, in Order No. 7751. WMATA and OPC bring these appeals challenging several aspects of the Commission's decision.

OPC argues that Chalk Point Unit 4 (CP–4), a power generating plant, was not "used and useful" and that PEPCO's decision to complete its construction was imprudent. As a result, OPC maintains, the Commission's decision permitting PEPCO to include an allowance for additional construction work in progress (CWIP) in its rate base was arbitrary and unreasonable. In addition, OPC contends that the Commission's decision allowing PEPCO to amortize over a ten-year period its loss resulting from the abandonment of Dickerson Unit 4 (DU–4), another generating plant, was arbitrary because, as in the case of CP–4, PEPCO did not demonstrate that the planning and cancellation decisions involving DU–4 were prudent.

WMATA argues that the Commission should have adjusted PEPCO's test-year revenues upwards by an additional $627,035, attributable to WMATA's projected increase in electricity consumption due to the extension of subway service on its Red Line. The Commission's failure to make this adjustment, WMATA contends, rendered its decision arbitrary and unreasonable. Furthermore, WMATA argues that it received a disproportionate and discriminatory rate increase, that PEPCO's use of the average and excess demand/non-coincident peak methodology (AED/NCP) for allocating demand costs discriminated against it, and that it was unlawful to require WMATA to pay a rate which factored in PEPCO's payment of a gross receipts tax imposed by D.C.Code § 47–2501 (1981).

## II. Standard of Review

■ The Commission, not this court, has the responsibility for setting utility rates and establishing rate designs. D.C.Code §§ 43–501, 43–601, 43–611 (1981); *People's Counsel v. Public Service Commission,* 472 A.2d 860, 862 (D.C.1984); *Metropolitan Washington Board of Trade v. Public Service Commission,* 432 A.2d 343, 350 (D.C.1981). In doing so, however, it must "arriv[e] at a fair balance between competing consumer and investor interests." *People's Counsel v. Public Service Commission,* 399 A.2d 43, 45 (D.C.1979); *accord, People's Counsel v. Public Service Commission,* 455 A.2d 391, 393 (D.C.1982).[1]

■ Our review of a Commission order "is the narrowest judicial review in the field of administrative law." *Potomac Electric Power Co. v. Public Service Commission,* 402 A.2d 14, 17 (D.C.) (en banc) (citations omitted), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). Under D.C.Code § 43–906 (1981) it is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless ... such findings ... are unreasonable, arbitrary or capricious." *See, e.g., United States v. Public Service Commission,* 465 A.2d 829, 832 (D.C.1983). In reviewing a Commission order, we must determine whether its overall effect is just and reasonable, *People's Counsel v. Public Service Commission,* 455 A.2d 402, 403 (D.C.1982); *Washington Public Interest Organization v. Public Service Commission,* 393 A.2d 71, 76 (D.C.1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979), and whether the Com-

mission "has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations." *Williams v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 342, 362, 415 F.2d 922, 942 (1968) (footnote omitted), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969), cited with approval in *Telephone Users Ass'n v. Public Service Commission,* 304 A.2d 293, 296 (D.C.1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1974).[2]

The Commission "has the burden of showing fully and clearly why it has taken the particular ratemaking action." *Washington Public Interest Organization v. Public Service Commission, supra,* 393 A.2d at 75; *see Washington Gas Light Co. v. Public Service Commission,* 450 A.2d 1187, 1193 (D.C.1982). "However, '[w]here the [Commission] has accompanied its ruling with the required full and careful explanation, that ruling is entitled to great deference.'" *People's Counsel v. Public Service Commission, supra,* 472 A.2d at 863, quoting from *Washington Gas Light Co. v. Public Service Commission,* 452 A.2d 375, 379 (D.C.1982), *cert. denied,* 462 U.S. 1107, 103 S.Ct. 2454, 77 L.Ed.2d 1334 (1983); *see People's Counsel v. Public Service Commission,* 462 A.2d 1105, 1108–1109 (D.C.1983).

## III. OPC's Contentions

### A. Chalk Point Unit 4

Construction of Chalk Point Unit 4 was begun in 1972 and completed in late 1981.[3]

---

**1.** "While we must ascertain that, in striking a balance between the competing consumer and investor interests, 'the Commission has given reasoned consideration to each of the pertinent factors,' ... we must not substitute our judgment for that of the Commission." *Potomac Electric Power Co. v. Public Service Commission,* 457 A.2d 776, 782 (D.C.1983) (citations omitted).

**2.** We have referred to this language from the *Williams* case as "the guiding rule for appellate review of utility agency orders...." *Potomac*

*Electric Power Co. v. Public Service Commission, supra,* 402 A.2d at 18.

**3.** CP–4 "was placed in service on December 7, 1981. Thus, the unit was available for .038% of the test period. The unit was certified at full-rated capacity in March 1982. The unit was actually operated on an economic dispatch basis for 15 hours during one day in 1981. From the beginning of the year through July 1982, it was operated for portions of nine days on an economic dispatch basis." Order No. 7716 at 62.

In the rate proceeding, PEPCO sought to include in the rate base the full amount of its end-of-test-period investment.[4] A majority of the Commission decided instead to allow PEPCO to include the average amount of test-period investment in the rate base. Chairwoman Ruth Hankins-Nesbitt dissented. She maintained that because CP–4 had operated only once during the test period, it was not "used and useful," and therefore PEPCO should not be allowed to recover "the *full* average value of CP–4 in rate base...." Order No. 7716, dissent at 4 (emphasis added).

OPC adopts the argument in the dissent that CP–4 was not "used and useful," but carries it a step further and contends that the Commission should not have allowed PEPCO to include any allowance for additional CWIP in its rate base.[5] Specifically, OPC argues that CP–4 was not used and useful because it rendered "extremely minor service" and because it was not until July 1982 that the unit provided "*some* service and demonstrated that it was reasonably free from significant design or construction defects and would continue to function in the proximate future."

█ "[A]n item may be included in a rate base only when it is 'used and useful' in providing service. In other words, current rate payers should bear only legitimate costs of providing service to them." *Tennessee Gas Pipeline Co. v. Federal Energy Regulatory Commission*, 196 U.S.App. D.C. 187, 202, 606 F.2d 1094, 1109 (1979), *cert. denied*, 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980); *accord, Washington Gas Light Co. v. Public Service Commission, supra*, 450 A.2d at 1226. In determining whether an item is used and useful, *i.e.*, whether it benefits ratepayers, the Commission must consider the most recent

available material, which would normally be found in post-test-year data. *Potomac Electric Power Co. v. Public Service Commission, supra*, 402 A.2d at 18.

The Commission noted that CP–4 was "being operated as a peaking unit" and that it would "continue to be in operation during the period that the rates resulting from this case [would] be in effect." Order No. 7716 at 62–63. The Commission also observed that Paul Waltz, an expert on its own staff,[6] had "inspected the unit twice and ... [found] it to be a good fuel oil cycling unit with good flexibility of operation." *Id.* at 63–64. Furthermore, it considered the testimony of a PEPCO witness, Edward Mitchell, who stated "that CP–4 incorporates heat rate improvement features not found in other units designed for cycling, and ... that CP–4 [had] the most useful design for meeting installed reserve and supply of peak period energy requirements." *Id.*

█ Thus, while it is true that CP–4 was in service for only a minuscule portion of 1981, post-test-year data demonstrated that CP–4 provided service to ratepayers. CP–4 functions as a peaking unit. The Commission found that "[h]ad CP–4 been delayed, projected reserves [in 1982] would have been 5.8%—far below the minimum necessary to maintain reliability of service." Order No. 7716 at 65. It considered alternative ways to treat CP–4 in determining the rate base and decided to permit PEPCO to include the average end-of-period value. OPC has not sustained its burden of showing that the Commission's decision in this respect was arbitrary or unreasonable.

OPC also assails the Commission's treatment of CP–4 on the ground that PEPCO's decision to complete it was imprudent. Specifically, it argues that "[a]s a result of

---

**4.** The parties stipulated that calendar year 1981 would be the test period.

**5.** "The Construction Work in Progress Method (CWIP), used by the PSC since 1948, allows a utility to include the funds invested in plant under construction in the rate base. Investors thus earn a return on these funds before the

plant goes into service." *People's Counsel v. Public Service Commission, supra*, 455 A.2d at 396.

**6.** The Commission had directed its staff to present testimony on certain issues. Order No. 7716 at 2 n. 3.

PEPCO's demonstrated failure to conduct, during the course of its planning and construction of Chalk Point Unit 4, the kind of timely economic studies that the Commission has held are required to assure properly efficient service, there can be no doubt that PEPCO has not proved the prudency of its investment in Chalk Point Unit 4." OPC recognizes that the Commission relied on two studies performed by PEPCO, one in 1975 and the other in 1979, in concluding that the "record [did] not support a finding that CP–4 was an imprudent investment." Order No. 7716 at 66. OPC contends, however, that this reliance was improper because those same studies were criticized in Formal Case No. 737 by the Commission. Its argument is misdirected.

Formal Case No. 737 was divided into two phases.[7] The first phase culminated in Order No. 7425, in which the Commission found that, given the inadequacy of generating reserves, CP–4, which was virtually completed, should be "brought on line as soon as operational." Order No. 7425 at 7. The order also said, however:

> [T]he Commission will proceed to take appropriate action on the question of conversion of CP–4 to coal-fired capability. The record clearly establishes the economic desirability of conversion, and we agree that PEPCO should have begun its evaluation far sooner. We cannot understand why PEPCO did not and we question the wisdom or prudence of PEPCO's management in this regard.

*Id.* at 8. After receiving additional information, the Commission concluded in Order No. 7795 not to require conversion of CP–4 from oil to coal. That order, which ended the second phase of Formal Case No. 737, was affirmed by this court in *People's Counsel v. Public Service Commission,* 474 A.2d 835 (D.C.1984).

In its order denying OPC's application for reconsideration in this case, the Commission observed:

> Essentially OPC is attempting here to parlay our criticism of PEPCO's system

planning methodologies made in [Formal Case] No. 737 into a finding of imprudence with respect to the specific system planning decisions made by PEPCO in the 1970's and early 1980's.

\* \* \* \* \* \*

Even if the Commission were to eventually determine that conversion of CP–4 to duel-fuel [*sic*] or coal capability is a feasible, cost effective path, that would not necessarily require a finding that PEPCO was imprudent in bringing the unit on line as an oil-fired unit.

Order No. 7751 at 10–11.

■ The Commission did not find, in any phase of Formal Case No. 737, that PEPCO's decision to continue construction of CP–4 as a coal-fired unit was imprudent. On the contrary, in the first phase of that case it agreed that CP–4 should be "brought on line as soon as operational." In Formal Case No. 785 (the instant case) it considered two studies by PEPCO which concluded that completion of CP–4 was the most cost-effective course of action. OPC has not convinced us that the Commission's agreement with this conclusion was arbitrary or unreasonable.

### B. *Dickerson Unit 4*

"In the early 1970's Dickerson Unit 4 was conceived as an 850 MW [megawatt] coal-fired, base load unit to be completed in 1976. As declining load-growth rate projections emerged in the 1970's, it was delayed and work was sharply curtailed on the unit. In 1977 the unit was replanned as an 800 MW joint venture with Baltimore Gas and Electric Co. (BG & E) scheduled for 1985, and later for 1987. In October 1979, BG & E withdrew from the joint venture, PEPCO sought a new partner for the venture without success, and in 1980 cancelled the unit in light of the continuing downward trends in load-growth rate projections." Order No. 7716 at 51.

---

7. Case No. 737 was primarily an investigation of PEPCO's construction program.

PEPCO sought to make up for the loss resulting from the closing of Dickerson Unit 4 (DU–4) both by amortizing the loss and by including the unamortized portion of the investment in the rate base. The Commission ruled that PEPCO would be allowed to do only the former. OPC argues that PEPCO did not prove that the planning and cancellation decisions involving DU–4 were prudent, and therefore that the Commission's decision to allow PEPCO to amortize its abandonment loss over a ten-year period was arbitrary and unreasonable.

■ The Commission carefully considered OPC's argument and rejected it in the following portions of its order:

Mr. Gold for OPC offered an economic analysis of alternative generation planning scenarios from which he concluded that installation of Dickerson Unit 4 in either 1985 or 1987 and the postponement of Chalk Point 4 until 1997 would have been more economic than PEPCO's actual course of conduct. Mr. Gold's study, however, is based upon current load forecasts and assumptions as to fuel and other costs, rather than on reasonable assumptions as of the late 1970's when the decision to cancel was made. This tends to undercut the probative value of the study, since the measure of prudence should be made as of the time the decision was made, not by hindsight.

\* \* \* \* \* \*

Finally, we note that PEPCO argues that OPC's underlying premise that Dickerson Unit 4 should have been moved up to replace Chalk Point Unit 4 was not a feasible option, because there was insufficient lead time as of 1980. OPC argues that the decision should have been made earlier than 1980. OPC's contention ignores the fact that prior to 1980, Dickerson Unit 4 was planned as a joint venture with BG & E which put constraints on PEPCO's ability to shift its scheduling. It also ignores the fact that from the end of 1978 PEPCO was anticipating the near-term retirements of the old Benning

and Buzzard Point units, producing a future need for cycling-to-peaking units, rather than base-load units such as Dickerson Unit 4 in the early 1980's.

We cannot find that PEPCO made an imprudent decision with respect to Dickerson Unit No. 4. To disallow amortization of the project loss would be to apply a standard—not of reasonable prudence, but—of absolute stockholder liability for plant cancellations. We decline to accept this standard, and we approve PEPCO's amortization proposal.

Order No. 7716 at 60, 62. These excerpts from the Commission's order fully meet the requirements of *Washington Public Interest Organization v. Public Service Commission, supra.* OPC has not met its "considerable" burden of demonstrating error. *People's Counsel v. Public Service Commission, supra,* 399 A.2d at 46; *see Goodman v. Public Service Commission,* 309 A.2d 97, 101 (D.C.1973).

IV. WMATA'S CONTENTIONS

A. *The Red Line Extension*

In December 1981 WMATA extended its Metro subway service on the Red Line for approximately two miles, from the Dupont Circle station to the Van Ness station. This extension of service added three additional passenger stations and two traction stations.

WMATA sought an upward adjustment of $627,035 in PEPCO's test-year revenues based on the increase in electricity purchases that would result from the extended rail system. In rejecting WMATA's proposed adjustment, the Commission said:

While in the past, the Commission has permitted adjustments in WMATA's billing determinants to reflect known and certain changes in Metro's ratcheted billing demands, here WMATA is seeking an adjustment of estimated annualized revenue dollars. However, WMATA offers no explanation of how that dollar figure was derived, so that the Commission is unable to evaluate the estimate. In the circumstances, we reject the proposed ad-

justment, which does not embody a known and certain change, but rather is based on an unverifiable estimate. Order No. 7716 at 91.

WMATA argues (1) that the Commission erroneously shifted the burden of proof from PEPCO to WMATA on this issue, and (2) that the Commission "had additional opportunity to direct PEPCO, or its own staff or the expert witnesses, to present the dollar estimates that [would] meet its needs for understanding the proper level of dollar amount that should be recognized for the additional operation of Metro."

■ These arguments are unpersuasive. WMATA asserts in its brief, as it did in its application for reconsideration, "that there cannot be better support for a 'certain and known change' than the *fact* itself that Metro is operating the extended rail system." In light of the record as a whole, however, this fact is entitled to little or no weight. As PEPCO demonstrated, there was no assurance that periodic increases in demand would be repeated in future billings. In fact, William Schmidt, a PEPCO witness, established that WMATA's actual demand in April 1982 was lower than the demand recorded in April 1981, despite the Red Line extension in December 1981. WMATA offered no countervailing evidence to support its contention that the test-year revenues should be adjusted. We find no error in the Commission's rejection of WMATA's proposal.

### B. *The Gross Receipts Tax and WMATA's Immunity*

WMATA argues that its tax-exempt status under the WMATA Compact[8] entitles it to a rate discount equal to its proportionate share of the District of Columbia gross receipts tax paid by PEPCO. The Commission properly rejected this argument.

Title III, § 78 of the Compact, D.C.Code § 1–2431 (1981), provides in pertinent part:

[T]he Authority [WMATA] ... shall not be required to pay taxes or assessments upon any of the property acquired by it or under its jurisdiction, control, possession or supervision or upon its activities in the operation and maintenance of any transit facilities or upon any revenues therefrom, and the property and income derived therefrom shall be exempt from all federal, State, District of Columbia, municipal and local taxation. This exemption shall include, without limitation, all motor vehicle license fees, sales taxes and motor fuel taxes.

Under D.C.Code § 47–2501 (1981),[9] PEPCO must pay "an excise tax on the privilege of furnishing franchised public utility services in the District." *Chesapeake & Potomac Telephone Co. v. District of Columbia,* 117 U.S.App.D.C. 21, 25, 325 F.2d 217, 221 (1963). WMATA contends that the legal incidence of this tax falls in part upon it, since the economic burden of tax is borne by PEPCO's retail customers. We do not agree.

In *United States v. New Mexico,* 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982), the Supreme Court considered the immunity of the federal government from state taxation[10] in a case involving a gross receipts tax imposed by New Mexico on the sale of goods and services in that state.

---

8. WMATA was created by an interstate compact between the states of Maryland and Virginia and the District of Columbia. *See generally Qasim v. WMATA,* 455 A.2d 904 (D.C.) (en banc), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983).

9. D.C.Code § 47–2501 provides in pertinent part:

All gas, electric lighting, and telephone companies, through their proper officers, shall make affidavit to the Board of Personal Tax Appraisers on or before the 1st day of August each year as to the amount of its or their gross earnings or gross receipts, as the case may be, for the preceding year ending the 30th day of June, and each ... electric lighting company ... shall pay to the Collector of Taxes of the District of Columbia per annum 6 per centum on such gross receipts, from the sale of public utility commodities and services within the District of Columbia.

10. *See McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

The United States challenged the payment of that tax by three contractors doing business with the federal government, arguing that the burden of the tax really fell on the United States because it would be paid out of the contractors' earnings under their government contracts. In holding unanimously that the federal government's immunity did not extend to the contractors, the Court declared:

> [I]mmunity may not be conferred simply because the tax has an effect on the United States, or even because the Federal Government shoulders the entire economic burden of the levy.... [T]ax immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned.

*Id.* at 734–735, 102 S.Ct. at 1382–1383.

■ In the present case, the gross receipts tax increases the rate paid by WMATA in the same proportion as it increases the rates of PEPCO's other customers. It is ultimately the customers, not PEPCO, whose money pays the tax. This shift of the *economic* burden, however, does not mean that the *legal* incidence of the tax falls on the customers. *United States v. New Mexico, supra; Gurley v. Rhoden,* 421 U.S. 200, 204–205, 95 S.Ct. 1605, 1608–1609, 44 L.Ed.2d 110 (1975); *United States v. Maryland,* 471 F.Supp. 1030 (D.Md. 1979). *Compare* D.C.Code §§ 47–2002, 47–2003 (1981) *with* D.C.Code § 47–2501 (1981) (the former providing for the recovery of the sales tax directly from the purchaser). Rather, as the Commission concluded, "PEPCO bears the incidence of the tax, and, through its cost-of-service rates, passes the economic burden of the tax along to its retail customers." Order No. 7716 at 119. Following the rationale of *United*

*States v. New Mexico, supra,* we hold that WMATA's immunity from taxation is not infringed because a component of its electric rate serves to reimburse PEPCO for the gross receipts tax it must pay to the District. The tax is merely one of the many costs which PEPCO must bear in order to provide electric service to its customers. The legal incidence of the tax remains at all times on PEPCO, just as it remained on the contractors in *United States v. New Mexico.* WMATA does not pay the tax at all, but merely reimburses PEPCO for *its* payment of the tax. WMATA's immunity remains inviolate.

## C. *The Rate Design*

■ The Commission permitted PEPCO to increase its revenues by $34,003,000 through an "across-the-board" rate increase, which was not really across the board because it excluded residential and street lighting customer classes. WMATA argues that this particular increase forces it to pay part of the cost of service for residential and master-metered apartment customer classes, that the rate of return it provides to PEPCO under the RT tariff is higher than the average rate of return under the GS tariff, and that the Commission used incorrect billing determinants in designing the RT tariff.[11]

With respect to the first of these arguments, the Commission ruled:

> We cannot agree with WMATA that it should be exempted from bearing its proportionate share of the revenue gaps produced by the transfer of the master-metered apartments to the residential class and the introduction of the RAR rate. WMATA has offered no grounds for treating it differently than the other commercial classes.

Order No. 7751 at 18. WMATA does not point to any evidence in the record, nor can

---

**11.** "RT" refers to PEPCO's Rapid Transit Schedule; "GS" refers to PEPCO's General Service Schedule. WMATA is apparently the only cus-

tomer of PEPCO's RT service. *See People's Counsel v. Public Service Commission, supra,* 462 A.2d at 1112.

we find any, which would support a different conclusion.[12]

As for WMATA's contentions regarding the rate of return under the RT tariff as compared with that under the GS tariff, the Commission recognized that the "across-the-board rate increase ... [would] produce from WMATA a rate of return slightly higher than the average for the GS class." Order No. 7716 at 155. "However ... growth in energy use and demand requirements of the WMATA system have required an increase in average system cost above what they would have been without the increased WMATA usage." *Id.* at 156. In its order denying WMATA's application for reconsideration, the Commission concluded:

> WMATA's argument merely confuses relative size of class with relative class rates of growth. Contrary to WMATA's claim, Metro's disproportionately high rate of growth is entirely consistent with PEPCO's overall growth pattern, and it, together with Metro's peak-oriented consumption pattern, completely justify [sic] a rate of return from Metro slightly higher than that from the GS average.

Order No. 7751 at 18. We agree.

■ Finally, with respect to WMATA's argument regarding the inaccuracy of the billing determinants, the Commission said:

> WMATA ... appears also to be confused regarding the establishment of its rates in our previous case, [Formal Case] No. 748. There we approved rates designed to equalize the RT and GS rates of return for the test year. It is no surprise that those rates, once approved, might produce somewhat different returns in the year subsequent to the test year.

Billing determinants obviously will not remain constant, but this fundamental fact in no way undermines the validity of the authorized rates.

Order No. 7751 at 18. Again we agree with the Commission. We see no legal error and no unfairness which would justify disturbing the Commission's ruling.

### D. *PEPCO's Cost-Allocation Methodology*

Finally, WMATA contends that the cost-allocation methodology authorized by the Commission was biased against the Metro RT class. Specifically, WMATA argues that the Commission erred in not recognizing that WMATA should be treated as a jurisdictional customer and that PEPCO's AED/NCP[13] methodology "penalizes a customer like WMATA that does not peak at the same time PEPCO peaks by allocating higher costs to it."

In rejecting both contentions, the Commission observed:

> Since it is not practical for PEPCO to meter the load flows between its retail jurisdictions on a continuous basis due to the density of the system and the preponderance of underground boundary crossings, PEPCO determines the jurisdictional NCP from a combination of actual meter read data and load survey data by customer classes for each jurisdiction. Once the system costs have been allocated to the relevant jurisdiction, the NCP for the customer classes within the jurisdiction are used to further allocate jurisdictional costs to the various customer classes. This is a proper application of the AEC cost allocation technique and is consistent with the allocation methodolo-

---

**12.** We reject as irrelevant to this issue WMATA's assertion that it is "a governmental entity ... and not a commercial customer as erroneously perceived by the Commission in its ... order on reconsideration."

**13.** According to the Commission's brief:
 *Coincidence peak* (CP) simply refers to determining the highest amount of power used by a customer class during the peak periods—when the greatest energy demands are made

on the system. *Non-coincidence peak* refers to determining the highest amount of power used during off-peak periods.... The AED/NCP methodology allocates demand costs by combining the average amount of power used and the excess of the NCP demand, which is the difference between the average demand and the highest amount of power used during the off-peak periods.

gy employed by PEPCO in [Formal Case] No. 758. Use of this method allows load characteristics of the different classes to be specifically recognized, and in addition, recognizes that base load generating units installed for off peak service have a higher capital cost and lower energy cost than units added primarily for peaking purposes. The data presented by Mr. Labonski indicate that WMATA is indeed highly coincident with the PEPCO system and contributes a high fraction of its maximum demand at the time of the PEPCO system peak, and that the peak thus far incurred in 1982, at 5 p.m. on July 19, 1982 (4146 MW) was highly coincident with the normal time of the WMATA peak.

WMATA's request that it be treated as a separate jurisdiction in PEPCO's jurisdictional cost allocation would entail a rather fundamental revision of the study methodology. WMATA offers no reason for its apparent failure to make this request in [Formal Case] No. 758 where it more properly belonged. While WMATA claims the present method is "biased" against it, the Commission has been given no specifics as to the extent of any adverse impact on WMATA arising from the claimed bias. More than WMATA has offered is required in order to persuade the Commission to direct a change in an allocation methodology so recently approved by it.

Order No. 7716 at 161.

 WMATA has not sustained its burden of demonstrating legal error in this ruling. *See People's Counsel v. Public Service Commission, supra,* 399 A.2d at 46; *Goodman v. Public Service Commission, supra,* 309 A.2d at 101. Its arguments on these points raise issues that are really questions of regulatory policy;[14] our review of a Commission order, however, is "limited to questions of law...." D.C. Code § 43–906 (1981). Policy decisions are within the exclusive domain of the Commis-

sion. They are beyond both the jurisdiction and the competence of a reviewing court.

*Affirmed.*

---

14. The same thing may be said about many of OPC's arguments.