104 Wn.2d 798 (1985)
711 P.2d 319
PEOPLE'S ORGANIZATION FOR WASHINGTON ENERGY RESOURCES, ET AL, Petitioners,
v.
THE UTILITIES AND TRANSPORTATION COMMISSION, ET AL, Respondents.
No. 50264-1.
The Supreme Court of Washington, En Banc.
December 12, 1985.
Elizabeth Thomas of Evergreen Legal Services, for petitioners POWER, et al.
Kenneth O. Eikenberry, Attorney General, John R. Ellis, Deputy, and Charles F. Adams and Robert F. Manifold, Assistants, as petitioner Public Counsel.
Kenneth O. Eikenberry, Attorney General, and Donald T. Trotter, Assistant, for respondent Utilities and Transportation Commission.
Perkins Coie, William S. Weaver, Priscilla W. Derick, and Jeffrey D. Hutchings, for respondent Puget Sound Power and Light.
Robert L. Simpson and David J. Meyer on behalf of Washington Water Power, amici curiae for respondents.
ANDERSEN, J.

FACTS OF CASE
Petitioners are the People's Organization for Washington *800 Energy Resources (POWER) and the Public Counsel Section of the Attorney General's Office. They challenge orders of the Washington Utilities and Transportation Commission (WUTC) approving a rate increase for Puget Sound Power and Light Company. The rate increase was not stayed and is currently in effect. The basis of petitioners' challenge to the rate increase is the authority of the WUTC to include in rates, as an operating expense, costs prudently incurred by Puget Power for the planning and designing of the subsequently canceled nuclear electrical generating project at Pebble Springs, Oregon. We affirm the WUTC.
This case cannot be properly considered apart from the historical context in which it arose.
In the 1970 National Power Survey, produced by the then Federal Power Commission, this urgent warning was sounded:
"Mounting demand, sharply rising costs, and changing social values have combined to place unusual stress on the U.S. electric power industry.... We foresee recurrent and spreading power shortage unless positive steps are taken, and taken soon, to remedy conditions which are slowing the orderly development of essential power supplies."[[1]]
At about this same time, our Legislature enacted thermal power plant siting legislation declaring that "[i]t is the policy of the state of Washington to recognize the pressing need for increased energy facilities ..."[2]
The same perceived energy shortages which were recognized by federal and state governments also influenced individual electric utilities. Puget Power's situation was that it served a territory which had historically experienced higher than average load growth and this growth was projected to continue. Puget Power's agreement to acquire an interest in the Pebble Springs nuclear generating plant, *801 which is the project involved in this case, was signed not long before President Carter gave his now famous speech to a joint session of Congress and to the American people referring to the energy crisis and its solution as "the moral equivalent of war."[3]
By 1981, however, the situation had changed drastically. The nation had experienced the Arab oil embargo, double digit inflation, recurring economic recessions, the Three Mile Island nuclear accident (March 1979) and accelerated government control over plant siting and expansion. In addition, a substantial and broadly based effort to cut energy consumption through conservation, load management and other measures designed to reduce the projected need for new electric plant capacity was initiated.[4]
By 1982, it was reported that in the previous decade 91 nuclear power plants had been canceled[5] and a Nuclear Regulatory Commission report estimated that electric utilities were likely to cancel another 19 nuclear power reactors in various phases of construction.[6] These project abandonments occurred after staggering amounts of capital had been invested in planning, siting and acquiring equipment. The financial, economic and social effects of the turnaround in the demand for energy and nuclear facilities in but a single decade were calamitous. Included in the fallout from all of this is the question of who should pay for the costs associated with the abandonment of generating plants before they became operable and of any use to the electric utilities and their customers. This is a problem of national consequence which in this state we address for the first *802 time in this case.
In 1976 Puget Power exchanged a portion of its share of the Skagit Nuclear Project in this state for a 23.5 percent share of the Pebble Springs Nuclear Project in Oregon which was sponsored by the Portland General Electric Company. Puget Power's objectives in this exchange were achieving maximum flexibility in scheduling generation to meet future load, attempting to optimize capital construction cash flows, spreading the risks of licensing, construction, and operation of large generating units, minimizing overall construction costs and optimizing fuel purchases and use.
Although prior approval of the investment, as such, by the WUTC is not required under the statutes and regulations of this state, the WUTC did review Puget Power's involvement in the Pebble Springs project in a variety of contexts  rate cases, approval of budgets, approval of securities issues, and in at least one proceeding which focused on Puget Power's forecasted load-resource imbalance.
The Pebble Springs project was ultimately canceled as a result of a number of factors, including large drops in forecasted load growth, rapidly escalating construction costs and the passage of Ballot Measure 7 in Oregon (an Oregon initiative passed in November 1980) which prohibited siting nuclear plants in that state until approval of a nuclear waste storage site. Actual construction on the project was never begun. Ultimately, on October 8, 1982, a termination agreement was entered into by the project participants.
Puget Power's investment in the Pebble Springs project as of June 30, 1982, the end of the "test year" in the rate case being appealed, was $76.9 million. The termination produced a loss for income tax purposes, leaving a net investment of $53.5 million. Puget Power asked the WUTC for permission to recover back its net investment in rates over a 5-year period. It also asked permission to earn its authorized rate of return on the declining unamortized balance during this period as compensation for its costs of capital associated with carrying the investment over the *803 write-off period.
The WUTC denied Puget Power's request and, instead, authorized a lesser recovery over a 10-year period but with no recovery to Puget Power of the costs of capital connected with the unamortized balance. Thus the WUTC allowed Puget Power to ultimately recover, through rates, $47.5 million rather than Puget Power's full $53.5 million net investment. The part of the rate increase attributable to Pebble Springs increased the average residential customer's monthly billing by $1.12.
In its rate order, the WUTC reviewed the history of the Pebble Springs project and Puget Power's role therein. The WUTC also reviewed the presentation of the WUTC staff, the only party to present direct evidence on the prudence of Puget Power's investment in Pebble Springs and the subsequent abandonment. The staff was of the opinion that costs for the plant should have ceased being accrued by Puget Power as soon as Oregon's Ballot Measure 7 became law. The WUTC, however, decided that the company had needed time to study its options after that event and, in disagreeing with both staff and Puget Power, reasoned that as of April 9, 1982, costs for the Pebble Springs project should have ceased being accrued.
On the issue of prudence, apart from the cutoff time for the accrual of costs, the WUTC noted that "witness after witness denied that they were questioning the prudence of any of the company's decisions." The WUTC nonetheless indicated that it did weigh the evidence in deciding the prudence issue.[7]
The WUTC found that Puget Power's investment in Pebble Springs, as well as its subsequent abandonment of the project, were both prudent. We do not understand the petitioners to contest this.
In its rate order, the WUTC also reiterated in this case a statement it had made in a prior rate case, reasoning in part:

*804 It is simply one of the realities facing both investors and consumers of electric utility service that in order to provide continuity of service and to provide for continuing generation needs, a utility must undertake massive investments yet must maintain its financial integrity. Where necessary, this may involve a sharing of responsibilities and risks by both shareholder and ratepayer groups.[[8]]
Then, applying this reasoning to Puget Power's situation in this case, the WUTC added:
In order to preserve the ability of the company to render service to the public at reasonable rates, a shared responsibility of the loss in Pebble Springs is required.
The Commission is of the opinion that the most equitable allocation of the company's loss associated with the Pebble Springs project is to allow it to expense the loss over a period of ten years, and to reject its request to include the unamortized balances in rate base.[[9]]
The WUTC also found the rates set by its order to be "just, reasonable and sufficient."[10]
On July 25, 1983, the WUTC served its Order on the merits of the case, which was denominated its Third Supplemental Order. An addendum was issued on July 28, 1983. Then, following the filing by Puget Power of a petition for reconsideration on August 4, 1983, the WUTC on September 8, 1983, issued its Fifth Supplemental Order.
Petitions for review were filed in the Superior Court for Thurston County by POWER on September 9, 1983, and by Public Counsel on September 16, 1983. The Superior Court certified the appeal to the Court of Appeals,[11] following which this court granted discretionary review.
One ultimate issue is presented.

*805 ISSUE
Does the WUTC have authority to allow an electric utility to include in rates, as an operating expense, repayment of costs incurred by the utility for planning and designing a subsequently canceled nuclear generating facility?

DECISION
CONCLUSION. The WUTC, as the regulatory agency charged by law with the setting of just, reasonable and sufficient public utility rates in this state, is empowered to allow a utility to amortize to expense costs incurred in an abandoned electrical generating project, if the project was prudently undertaken and terminated by the utility (as the WUTC found that it was) and if the WUTC fairly weighed both consumer and investor interests in arriving at its decision (as the record establishes that it did).
We reject, at the outset, the notion that this case involves no more than the simple issue of who bears the loss associated with a canceled nuclear power project. The ramifications are much broader than that and the case potentially affects the basis of all utility regulation in this state. In the most comprehensive opinion yet written on the subject, the Massachusetts Department of Public Utilities observes that "[t]he matter is complex in the extreme."[12] In that case, the Massachusetts Commission allowed canceled plant costs to be amortized over a several year period, as did the WUTC in this case, and the Massachusetts Commission's decision was upheld by Massachusetts' highest court.[13]
The Massachusetts decision is both pertinent and instructive in putting the issue into perspective:
In our view, the question presented by the demise of the Pilgrim II [nuclear] project is one of the most serious and the most controversial regulatory issues that the department has ever confronted. At a minimum, the disposition *806 of this question will affect the company and the customers who rely upon its necessary energy services for years to come. Beyond that, this decision may impact the provision of all regulated public services in the commonwealth in both the short- and long-term. The matter is complex in the extreme.
This decision has required us to address the very foundations of public utility regulation. Accordingly, our analysis begins with a discussion of the nature of regulated utilities and the unique relationship that exists between those who provide and those who consume regulated public services.
Even before beginning this discussion, we confront a threshold question. Why is this a complex issue at all? Is not the answer to the question, who should pay for a failed utility project, obvious? Credible and sincere people argue that the answer is in fact obvious. The most cited "obvious" answer is that privately held companies, in a free economy, must absorb the loss of failed projects, as both the consequence and the price of the right to profits. There would be no meaning to success if there were no failures. With the right to succeed comes the right to fail, with its beneficial cleansing of inefficiencies from the market.
And, it is not market theories alone that motivate those supporting this apparently obvious result. When customers feel they have little or no control over a matter and when they receive no benefits, equity seems easily to reside on the side that concludes that these customers should have no obligation to pay. Finally, there are those who simply have adopted the adversarial, "us against them" perspective, which our system clearly entitles them to do. From this vantage point, the view is by design so narrowed that only the short-run conflict of economic interests stands out, while the long-term implications are ignored.
As we have already suggested, all of these perspectives are fundamentally at odds with our own. The threshold question must, in our view, be answered, "No." It is, we submit, not obvious who should pay for this failed *807 project. The reason that it is not obvious is that all necessary considerations cannot even be identified without the broadest possible perspective and a clear understanding of the nature of regulated utilities.[[14]]
(Footnote omitted.)
By way of aid to an understanding of this issue and our resolution of it, it is necessary to first review the basic principles of public utility ratemaking. For, as the late Justice Frankfurter wrote: "[t]he determination of utility rates  what may fairly be exacted from the public and what is adequate to enlist enterprise  does not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment. These are matters for the application of whatever knowledge economics and finance may bring to the practicalities of business enterprise."[15]
The states have the right under their police power, and within constitutional limitations, to regulate public utilities operating within their borders and to prescribe reasonable rates at which charges may be made by public utilities for their services to the public.[16]
[1] The function of ratemaking is legislative in character and may be directly exercised by the Legislature itself or, as in the usual case, by administrative bodies endowed to that end.[17] It follows that the judicial branch of government is not empowered to usurp this legislative authority *808 by itself undertaking to fix rates.[18]
In this state, the Legislature has conferred the ratemaking power on the WUTC, subject, of course, to appropriate judicial review.[19] Most states delegate their ratemaking power to regulatory agencies in very broad terms, basically just directing them to set those rates which the agencies determine to be just and reasonable.[20] Washington is such a state. As this court pointed out in Jewell v. State Utils. & Transp. Comm'n, 90 Wn.2d 775, 777, 585 P.2d 1167 (1978), "the statutory direction to the commission in rate setting is broadly stated." (Italics ours.) The statutory mandate to the WUTC is to set fair, reasonable and sufficient rates. RCW 80.28.010-.020. Indeed, as this court has also observed, the paramount objective of the Legislature in creating the commission, now the WUTC, "was to secure for the public safe, adequate, and sufficient utility services at just, fair, reasonable, and sufficient rates." State ex rel. PUD 1 v. Department of Pub. Serv., 21 Wn.2d 201, 209, 150 P.2d 709 (1944).
Following this broad standard, then, the WUTC must in each rate case endeavor to not only assure fair prices and service to customers, but also to assure that regulated utilities earn enough to remain in business  each of which functions is as important in the eyes of the law as the other.[21]
In order to control aggregate revenue and set maximum rates, regulatory commissions such as the WUTC commonly *809 use and apply the following equation:

 R = 0 + B(r)

In this equation,
R is the utility's allowed revenue requirements;
O is its operating expenses;
B is its rate base; and
r is the rate of return allowed on its rate base.
Although regulatory agencies, courts and text writers may vary these symbols and notations somewhat, this basic equation is the one which has evolved over the past century of public utility regulation in this country and is the one commonly accepted and used.[22] We here use this equation for illustrative purposes in order to make more clear what the WUTC did in this case.
Once the utility's aggregate allowed revenue requirements (R) are determined by using this equation, based thereon the regulatory agency then establishes the maximum rates the utility can charge for its products to each class of customers according to the agency's calculation of the rates that, when multiplied by the expected number of units of the product or service sold, will yield to the utility its aggregate allowed revenue requirements (R).[23]
To then break this equation down into its component parts.
First, the B term is the "rate base" which represents the total investment in, or fair value of, the facilities of the utility employed in providing its service.[24] Calculation of the rate base is of obvious importance since the product of the rate base (B) multiplied by the allowed rate of return *810 (r) accrues to the utility's investors.
Next, the r term is the rate of return that the utility is allowed to earn on its investment, i.e., on its rate base (B).[25] In theory, r is the utility's cost of capital, or the amount of money it must spend to obtain the capital it uses to provide regulated products. Rate of return is the weighted average cost of the utility's various sources of capital (the interest it pays on its debt and the rate of return on its equity) that is necessary to permit it to continue to attract the capital required to provide the regulated product or service  in this case, electricity.[26]
The O term in the equation refers to the operating expenses the utility incurs to provide the regulated product or service. Customarily, O is determined based on actual operating expenses in a recent past period referred to as the "test period" or "test year".[27] A utility cannot include every expense it wishes in this operating expense category since the regulatory agency has the power to review operating expenses incurred by a utility and to disallow those which were not prudently incurred.[28] To this end, detailed accounting systems are almost uniformly set up by the utilities, as in this state, where a "uniform system of accounts" has been adopted by the WUTC,[29] and which accounts are regularly audited by the regulatory agency. The effect of disallowing an item of operating expense for ratemaking purposes does not relate to whether the utility had the *811 right to incur it or not. Rather, the utility is not permitted to recover the expense in question in its rates to customers who purchase a regulated product or service. Thus, the shareholders of the utility must absorb the disallowed expenses, with a resulting reduction in the actual rate of return earned by them. This means that disallowance of an expense in a rate case has the very real effect, among others, of increasing the risks of investing in the utility.[30]
Turning from the details of the equation used to determine a utility's revenue requirements (R), it is also helpful to consider rates in the broader perspective of the functional "end result" test announced by the United States Supreme Court in FPC v. Hope Natural Gas Co., 320 U.S. 591, 88 L.Ed. 333, 64 S.Ct. 281 (1944); that is, that rates, no matter how they are determined, need only "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed ..." Hope Natural Gas, 320 U.S. at 605. That test was given further content in the Permian Basin Area Rate Cases, 390 U.S. 747, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968), which held that a regulatory agency's rate decision would be affirmed if it fell within the "zone of reasonableness". Permian Basin, 390 U.S. at 797. In Permian Basin, the United States Supreme Court also provided the classic articulation of a reviewing court's role:
It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate *812 protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

(Italics ours.) Permian Basin, 390 U.S. at 791-92.
While modernly a reviewing court's role in this state is delineated by the administrative procedure act, RCW 34.04.130(6),[31] these classic statements from Hope Natural Gas and Permian Basin continue to provide guidance in the judicial review of rate cases; and it remains the law that courts are not at liberty to substitute their judgment for that of the WUTC.[32] Thus, within a fairly broad range, regulatory agencies exercise substantial discretion in selecting the appropriate ratemaking methodology.[33]
Although it has not often had to be resorted to in modern ratemaking cases, it is also to be kept in mind that there is a constitutionally based floor below which a rate ceiling set by a regulatory agency will be reversed by the courts as confiscatory.[34] This is based on the prohibitions in the fifth and fourteenth amendments to the United States Constitution against taking private property for a public use without just compensation.[35] Put succinctly, the "power to regulate is not a power to destroy ..." Stone v. Farmers' Loan & Trust Co., 116 U.S. 307, 331, 29 L.Ed. 636, 6 S.Ct. 334, 388, 1191 (1886). In State ex rel. Pac. Tel. & Tel. Co. v. Department of Pub. Serv., 19 Wn.2d 200, 266, *813 142 P.2d 498 (1943), this court quoted with approval from Bluefield Water Works & Imp. Co. v. Public Serv. Comm'n, 262 U.S. 679, 692, 67 L.Ed. 1176, 43 S.Ct. 675 (1923):
"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. ..."
(Italics ours.)
We then apply the foregoing principles to the case before us.
This rate case was conducted before the WUTC. It was an extensive one. There were 7 parties (including 4 intervenors), 27 witnesses, 182 exhibits and 3,453 pages of transcript. Extensive prefiled testimony and briefs were submitted by each of the parties. Some 19 days of hearings were conducted in population centers in Puget Power's service area in order to provide a full opportunity for input from ratepayers and interested persons as well as from all of the parties. There is no suggestion that the proceedings were not fair to all parties in every respect. Following the hearings, the WUTC set rates which in its judgment were fair, reasonable and sufficient, as required by statute.
The WUTC did this by substantially applying the generally accepted equation (set out above) determining the aggregate revenue (R in the equation) required by Puget Power and then setting consumer rates accordingly.
In applying the formula, the WUTC determined the rate base (B) by evaluating Puget Power's investment in its *814 property and facilities and then multiplied that by what it considered to be a fair rate of return (r).
The WUTC then computed Puget Power's operating expenses (O) and added them into the equation, as was proper. In this connection, the WUTC also included within the operating expense factor (O) repayment of part of Puget Power's net costs incurred in planning and designing the abandoned Pebble Springs generating facility; and to this the petitioners object on several grounds.
As discussed, the WUTC did not allow any part of the abandoned nuclear facility costs to be placed in the rate base (B), as some commissions have done under like circumstances. To have done so would have resulted in Puget Power's investors profiting from the costs of the abandoned project when the allowed rate of return (r) was applied to a rate base (B) incorporating those costs. Instead, the WUTC permitted only those costs, which in the WUTC's judgment had been prudently incurred on the abandoned project, to be recovered by Puget Power over a 10-year period during which the unamortized costs would earn nothing for Puget Power or its investors.
Puget Power's request to include the unamortized costs of the Pebble Springs project in the rate base (B) was denied in light of RCW 80.04.250, which reads in relevant part:
Valuation of public service property. The commission shall have power upon complaint or upon its own motion to ascertain and determine the fair value for rate making purposes of the property of any public service company used and useful for service in this state and shall exercise such power whenever it shall deem such valuation or determination necessary or proper under any of the provisions of this title.
(Italics ours.) As recently held by this court in People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n, 101 Wn.2d 425, 679 P.2d 922 (1984) (hereinafter Power), construction work in progress (CWIP) on two Colstrip, Montana, coal-fired generating plants (Units 3 and 4) *815 and Washington Public Power Supply System (WPPSS) plant No. 3 in this state could not be included in rate base. Based on this statute, it was there held that "[o]bviously, an uncompleted utility plant is neither employed for service nor capable of being put to use for service; therefore, such a plant is not `used and useful' for service as required by RCW 80.04.250, and the Commission exceeded its statutory authority by including CWIP in [the utility's] rate base." Power, 101 Wn.2d at 430.
[2] Petitioners further argue herein, however, that based on this same statute (RCW 80.04.250), we should now apply the "used and useful" standard to operating expenses (O in the above equation) as the Power case applied it to rate base (B in the above equation). They further argue that so applied, the foregoing statute precludes the placing of any of the costs of an abandoned project like Pebble Springs into operating expenses (O) since the Pebble Springs expenditures will never be "used and useful".
The property on which a public utility is entitled to earn a fair return is that which is used and useful for public service at the time the inquiry as to rates is made.[36] Since the WUTC only allowed Puget Power to amortize abandoned plant costs, and did not include those costs within rate base or otherwise enable it to earn a return thereon, the "used and useful" concept is not involved. Those few cases from other jurisdictions which suggest otherwise, therefore, are not in point in this regard;[37] however, they will be further discussed shortly.
Our statute, RCW 80.04.250, is purely a rate base statute and does not apply to operating expenses. The cases in this *816 jurisdiction have so treated it and so do we.[38]
Petitioners claim, however, that the absence of the term "rate base" from the statute suggests otherwise. We disagree. While the statute does not use the term "rate base" it does use the word "valuation", and historically "valuation" in a ratemaking context is a function of "rate base".[39] This statute is an older statute first enacted in its original form when the WUTC's predecessor, the Public Service Commission, was created in 1911.[40] As one scholarly treatise explains:

The rate base, or "valuation" as it was called in former years, represents the total quantum of invested capital or of property "values" on which the company is entitled to a reasonable rate of compensation.
(Italics ours.) J. Bonbright, Public Utility Rates 149-50 (1961). Other texts on the subject amply support this view.[41] Rate base (B) is "valued";[42] whereas operating expenses (O) are not "valued" as such, but are determined according to modern utility bookkeeping methods.[43]
[3, 4] Petitioners also challenge the inclusion of costs of the abandoned project as "operating expenses" (O) on the basis that they are not within any reasonable definition of *817 that term. The difficulty with that argument in this state, however, is that in dealing with "operating expenses" (O), we are not seeking to apply a statutory definition of the term nor are we dealing with precise words of legal art. As previously discussed, Washington is one of the majority of states wherein the legislatures have delegated the ratemaking authority to the regulatory agency in very broad terms. As a consequence, there is no statutory definition of "operating expenses" in this state.
Our review of the cases on the subject reveals an extraordinarily broad array of costs which have been allowed as operating expenses, all having in common only that in the considered judgment of the agency charged with regulating utilities, the costs were appropriately utility related.[44] In the final analysis, as Professor Priest's authoritative text instructs:
The fundamental question is one of fact. As the Court of Appeals for the District of Columbia Circuit observed:
Expenses (using that term in its broad sense to include not only operating expenses but depreciation and taxes) are facts. They are to be ascertained, not created, by the regulatory authorities. If properly incurred, they must be allowed as part of the composition of the rates. Otherwise, the so-called allowance of a return upon the investment, being an amount over and above expenses, would be a farce.
1 A. Priest, Public Utility Regulation 49 (1969), quoting from Mississippi River Fuel Corp. v. FPC, 163 F.2d 433, 437 (D.C. Cir.1947). We consider this to be the sounder view. This is not to say, however, that a WUTC order allowing or disallowing a particular item as an operating expense may not be reversed by the courts if the record establishes that the order was arbitrary or capricious  or is improper on some other ground within the permissible scope of judicial review as prescribed by the administrative *818 procedure act.[45] We must, therefore, go further and address the substance of the WUTC decision in this regard.
The decision of the WUTC reads:[46]
Decision
The Commission is faced with a company which has a bond rating of bbb, a rating which must be retained for reasonable access to capital markets. The company is in a weakened financial condition and is still encumbered with a construction program which, while reduced significantly, is still massive and will require a high degree of investor confidence in the company in order to raise these funds. To restore Puget to financial viability the Commission has ordered:
...
(5) The Pebble Springs project is to be amortized over a ten-year period with the unamortized portion not receiving a return. This treatment results in a 70/30 split of the loss between ratepayers and stockholders and places some of the costs on future ratepayers who would have benefited from the project.
Further in this regard, the WUTC found as a fact:[47]
The shareholders of the company and the ratepayers will jointly derive benefits if the company is authorized to amortize its investment associated in the Pebble Springs project over a period of ten years and the unamortized balance is not included in the rate base. Among the benefits the stockholders will experience is a stabilization of the company's earnings and favorable reaction from investors. The ratepayer will, in the long run, receive the benefit of the company's ability to obtain finances at lower rates than otherwise. The benefits are jointly shared by the stockholders and ratepayers and the loss associated with Pebble Springs should be shared by both parties in order for the company to serve its customers at the most economical level and the shareholders to receive a reasonable return on their investment.
*819 It is thus clear that the WUTC carefully balanced investor and consumer interests, as it was obligated to do,[48] and set a rate which it determined would assure fair prices and service to the ratepayers on the one hand yet allow sufficient earnings to keep the financially hard pressed Puget Power in business on the other.
Approximately 100 state regulatory agencies in some 33 jurisdictions have faced the question of how to allocate the burden of costs associated with abandonment of power plant projects.[49] As the Supreme Judicial Court of Massachusetts summarized in Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414, 422 (1983):
A substantial majority of the public utility regulatory agencies that have considered the question have permitted a utility to recover all or some portion of the prudently incurred costs of a nuclear power plant reasonably abandoned before completion.
(Footnote omitted. Italics ours.)
In Attorney General, the court affirmed a decision of the Massachusetts Department of Public Utilities and held that the Department had the authority to permit an electric utility to recover by amortization a portion of its investment in the Pilgrim II nuclear power plant reasonably abandoned before completion. The finding of the Department in that case, which is quoted in part in the court's decision, well expresses from the ratepayers' point of view what is really involved in such a decision:
If the company now absorbs the Pilgrim II [nuclear power plant] loss, regulatory policies, and the returns they dictate, appear to us to be inadequate to compensate *820 investors for the new level of risk. Investors who are inadequately compensated do not remain investors for long. The adverse financial consequences which flow from such circumstances are, in our opinion, inevitable and devastating. The company goes to great lengths in describing how earnings will indefinitely be depressed, stock prices will tumble, bond ratings will collapse, and future capital, if available at all, will be prohibitively priced. Stripped of hyperbole, this assessment remains accurate enough to cause us great pause. The disdain of the financial markets for this company will be formidable, and that disdain can only mean that eventually the customers of the company will pay a high price in terms of both extravagant compensation for new capital and an unavoidable service deterioration reflecting the scarcity of reasonably priced capital. In a very real sense, what we face today is not the question, who should bear the costs of Pilgrim II. It is, rather, when should those costs be faced.[[50]]
(Footnote omitted. Italics ours.)
As with regulatory agencies, the substantial majority of courts that have considered the matter have also allowed utilities to recover abandoned plant costs, prudently incurred, as operating expenses or as expenses which could otherwise be amortized.[51]
*821 A minority of courts have ruled otherwise. The Wyoming[52] and Indiana[53] courts, previously cited in our discussion of the "used and useful" issue,[54] denied recovery on the basis that under their utility statutes and practice the "used and useful" principle was applicable to abandonment costs and/or that abandoned plant costs were not "operating expenses". For the reasons detailed above, we disagree with that viewpoint. The Ohio[55] and New Hampshire[56] courts also denied recovery, but did so on the basis of specific regulatory statutes in those states. Those statutes have no counterpart in this state and for that reason are not in point. The New Hampshire statute, for example, specifically directs that "[a]t no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed."[57]
The latter two of these courts with a contrary view are worthy of further note. Although the Ohio court reversed its commission, in doing so it specifically acknowledged that "the overwhelming weight of authority from other jurisdictions supports the position of the commission."[58] Similarly, the New Hampshire court in its ruling referred to the contrary Massachusetts view (above discussed with approval) as being in accord with "the overwhelming majority of *822 other jurisdictions."[59]
Returning to the case before us, the WUTC concluded:
The authority granted herein to [Puget Power] to expense its costs associated with its loss on the Pebble Springs Project is not contrary to RCW 80.04.250 and is consistent with the Commission's obligation to set rates that are fair, just and reasonable as provided in RCW 80.28.020.
Conclusion of law 3.[60]See also RCW 80.28.010. Based on our review of the entire record presented, we agree.
The WUTC is accorded considerable discretion in determining which items should be included within utility operating expenses (O) and which items should be excluded therefrom.[61] Utilities such as Puget Power which operate under RCW Title 80 have statutory responsibilities in connection with assuring that an adequate supply of electric power will be available to their customers.[62] Necessarily encompassed within a utility's obligation to serve is an attendant obligation to plan and make reasonable provision for the continuing availability of its products or services in order to meet reasonably expected future demand, given the information which the utility possesses and the options open to it. Under the law as set forth above, we conclude that the WUTC did not abuse the discretion reposed in it by law[63] when it authorized inclusion of prudent costs connected with the abandoned Pebble Springs nuclear generating plant within operating expenses for rate setting purposes.
*823 By entering its rate order in this case, the WUTC did not exceed its statutory authority and was not arbitrary or capricious. The proceeding before the WUTC fairly complied with its rules, and the essential elements of the order are supported by substantial evidence. The order was carefully drawn so that in the considered judgment of the WUTC it balanced and protected both the public interest and that of Puget Power, its shareholders and investors.[64] We conclude that the WUTC did not err.
Upholding the legality of the rate orders as we do, it is not necessary to further address Puget Power's unconstitutional confiscation argument.
Petitioners also make reference in their arguments to the effect of the WUTC budget statutes, RCW 80.04.300-.330. Those statutes are not pertinent to the issue. They contain no requirement that the WUTC give express prior approval for any particular expenditure. RCW 80.04.330 sets forth the consequences if an item which has been rejected from the utility's budget is contracted for by the utility, but since none of the costs involved in this case were ever rejected or excepted to by the WUTC that statute is not relevant. Furthermore, the WUTC acted in this rate case to determine the prudence of such costs, and this was an appropriate forum for such determination. RCW 80.04.310.
We also conclude that Chemical Bank v. WPPSS, 99 Wn.2d 772, 666 P.2d 329 (1983), relied on by petitioners, is not in point. That case held that public utility districts did not have the statutory authority to enter into certain contracts. There is no issue in the case before us as to the authority of Puget Power to enter into the contracts that it did.
Nor is the WUTC's Fifth Supplemental Order invalid because it was entered over 10 days after Puget Power's motion for reconsideration was denied, as argued by petitioners. Although under RCW 80.04.165 Puget Power's *824 motion for reconsideration would formerly have been automatically deemed denied after 10 days, that statutory time limit was superseded by the later enactment of a section of the administrative procedure act, RCW 34.04.130(1), which provides that the agency decision shall not be final until the agency shall have acted thereon. Entry of the Fifth Supplemental Order complied with the time limits of the later statute and that was sufficient.[65]
In petitioners' broad ranging arguments against the orders entered by the WUTC, they also appear to argue that: (1) the term "for service rendered" used in the rate setting statutes (RCW 80.28.010-.020)[66] is equivalent to the term "used and useful for service" in the rate base statute (RCW 80.04.250) which is set out and discussed *825 above; and (2) that the "used and useful" concept in the rate base statute is thereby statutorily mandated for inclusion in the rate setting statutes. This is a novel and incorrect reading of the rate setting statutes.
[5, 6] In construing statutes we are required to give words their usual and ordinary meaning.[67] In reading the rate setting statutes (footnote 66), it is clear that they are simply referring to "service rendered" in the context of utilities charging customers "for services rendered" or "services to be rendered" to their customers, and that these terms are used in much the same sense that lawyers charge their clients "for services rendered" and doctors charge their patients "for services rendered".
When the language of a statute is clear, we will respect it.[68] For us to read the "used and useful" concept of the rate base statute (RCW 80.04.250) into the rate setting statutes (RCW 80.28.010-.020), as petitioners suggest, would require that we read into the rate setting statutes matters which are not there and thus modify those statutes by construction. This we cannot do.[69]
One additional matter bears note. In arguing against petitioners' "used and useful applies to expenses" theory, the WUTC makes the point in its brief that "[a]doption of that theory could well be the death knell of `flow through' tax accounting, depriving the ratepayers of billions [of dollars], while depriving the Commission of a valuable ratemaking tool that can be used to keep rates as low as possible while still maintaining a company's financial viability." This concern is not answered in petitioners' briefs. Since we have declined to adopt petitioners' theory, we need not deal with the merits of this contention. We *826 believe, however, that even the possibility of such untoward ramifications underscores the wisdom of the salutary principle declared by this court in Farm Supply Distribs., Inc. v. State Utils. & Transp. Comm'n, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974), that
courts should not interfere with or substitute their judgment for a decision of the Commission when the Commission has acted properly within the sphere of its purpose, expertise and competence.
(Italics ours.) We adhere to this view.
All remaining issues have been answered by our decision herein or are rendered moot thereby.
Affirmed.
DOLLIVER, C.J., and UTTER, CALLOW, and DURHAM, JJ., concur. BRACHTENBACH, J. (dissenting)
The majority holds that the Washington Utilities and Transportation Commission (WUTC) has the authority to allow Puget Sound Power and Light Company to include in rates, as an operating expense, costs prudently incurred for planning and designing of a subsequently canceled electrical generating project that is abandoned and will never be used or useful for service. In so holding, the majority abdicates our proper role in reviewing the ratemaking process by the WUTC, distorts the meaning of "operating expenses", and ignores the mandate of the Washington statutory scheme. I dissent.
First, as to our role in review of the WUTC's determination, I recognize that the judiciary is not empowered to set utility rates. However, we are not only empowered but under a duty to review a decision of the ratemaking agency, the WUTC, under the administrative procedure act, specifically RCW 34.04.130. While we are not at liberty to substitute our judgment for that of the WUTC, Jewell v. State Utils. & Transp. Comm'n, 90 Wn.2d 775, 776, 585 P.2d 1167 (1978), we must determine whether the WUTC has acted in violation of constitutional provisions, RCW 34.04.130(6)(a); *827 in excess of its statutory authority, RCW 34.04.130(6)(b); in error of law, RCW 34.04.130(6)(d); or in an arbitrary or capricious manner, RCW 34.04.130(6)(f). In other words, we give deference to an agency's decision and judgment as long as the agency acts within the constitutional and statutory limits placed upon it. Jewell v. State Utils. & Transp. Comm'n, supra.
We are not, as the majority implies, limited in our review to a determination of whether the WUTC's rate decision falls within the "zone of reasonableness". Majority, at 811. The cases relied on by the majority for this lenient test are federal cases decided under the standard of review provided by federal statute. See 16 U.S.C. § 825l(b) (1983). The federal courts have traditionally determined whether the WUTC has properly balanced competing interests and affirmed the finding of the WUTC if supported by "substantial evidence". NEPCO Mun. Rate Comm. v. Federal Energy Regulatory Comm'n, 668 F.2d 1327, 1340 (D.C. Cir.1981); Union Elec. Co. v. Federal Energy Regulatory Comm'n, 668 F.2d 389 (8th Cir.1981); Permian Basin Area Rate Cases, 390 U.S. 747, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968). The federal courts do not consider the methodology used to compute the rates so long as the resulting rate is "reasonable".
Reliance on the Massachusetts case is similarly misplaced. The Massachusetts courts also function under the "substantial evidence" test and do not inquire into the specific methodology employed by the administrative agency. Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414 (1983). This standard of review is a product of the absence of any type of guidance in ratemaking; beyond that, the determination must be as the "public interest" requires. See Mass. Gen. Laws Ann. ch. 164, § 94 (West 1976).
In contrast, our statutory scheme, discussed below, sets forth restrictions on how rates may be computed; we must exercise our constitutional authority to insure that the proper methodology was utilized in fixing rates. People's *828 Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n, 101 Wn.2d 425, 679 P.2d 922 (1984). While the statutory direction to the WUTC in rate setting is broadly stated and while rate cases are complicated, under the guidance of RCW 34.04.130 we must review the WUTC's methods. If the utilities and the Legislature would like it otherwise, the statute should be changed.
The Legislature conferred upon the WUTC the power to regulate public utilities in order to ensure both that the public is given adequate service at just and reasonable rates in a monopoly situation and that the utility is allowed to charge rates which are just, reasonable and sufficient to allow it to render such service. RCW 80.28.020. The Legislature has provided specific statutory limits which must be considered under any formula used by the WUTC in the ratemaking process.
The formula generally used in the setting of utility rates requires four basic determinations: (1) What are the gross utility revenues under the rate structure examined? (2) What are the operating expenses incurred? (3) What is the rate base (utility property on which a return should be earned)? and (4) What percentage figure (rate of return) should be applied to the rate base in order to establish the return to which investors are reasonably entitled? 1 A. Priest, Public Utility Regulation 45 (1969).
In simplest terms, revenue is allowed to equal the total of approved operating expenses plus a reasonable return on the value of certain property. The return is calculated by applying a rate of return to the cost less depreciation of the company's property that is used and useful in the public service. The "used and useful" property is commonly spoken of as the rate base and includes the depreciated cost of plant in service and working capital. Operating expenses generally include those normal recurring costs incurred in the course of rendering service. Thus, the WUTC controls three variables in regulating rates to provide revenue to the company: operating expenses, rate base, and rate or percentage of return allowed on the rate base. This formula is *829 set forth in its basic form, Revenue = Operating Expenses + (Base Rate x Rate of Return), in the majority, at 808-09.
For Puget Power to recover its investment in Pebble Springs, it must be entitled to generate revenue determined by these variables. The WUTC's control of these variables is limited by statute. This is the essence of my dissent.
The statutory provisions governing rates and ratemaking provide as follows:
All charges made, demanded or received by any . .. electrical company ... for ... electricity . .. or for any service rendered or to be rendered in connection therewith, shall be just, fair, reasonable and sufficient.
(Italics mine.) RCW 80.28.010.
Whenever the commission shall find ... that the rates or charges demanded, exacted, charged or collected by any ... electrical company ... for .. . electricity ... or in connection therewith . .. are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in any wise in violation of the provisions of the law, or that such rates or charges are insufficient to yield a reasonable compensation for the service rendered, the commission shall determine the just, reasonable, or sufficient rates, charges, regulations, practices or contracts to be thereafter observed and in force, and shall fix the same by order.
(Italics mine.) RCW 80.28.020.
The commission shall have power ... to ascertain and determine the fair value for rate making purposes of the property of any public service company used and useful for service in this state and shall exercise such power whenever it shall deem such valuation or determination necessary or proper under any of the provisions of this title.
(Italics mine.) RCW 80.04.250.
The resolution of the basic issue of this action requires a determination of whether, in view of statutory limitations, the costs of the abandoned nuclear project are properly permitted to be included in rates as an operating expense item. This determination is not an exercise of forcing the construction costs into a formula which evolved well before *830 the concept of abandoned facility costs was imagined. Rather, the determination requires an analysis of the statute to determine if such construction costs figure into the ratesetting process at all.
This court recently addressed the issue of whether construction work in progress can be included in rate base for valuation purposes under RCW 80.04.250. People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n, 101 Wn.2d 425, 679 P.2d 922 (1984) (Power). Consistent with the language of RCW 80.04.250 and purpose of rate base valuation, this court stated:
Reviewing RCW 80.04.250 once again, we seek in vain for any indication that the Commission possesses untrammeled discretion with respect to which property may be included in rate base for ratemaking purposes. If property is not "used and useful" for service  and we have determined that CWIP [construction work in progress] is not  it may not be included in rate base. Nor do we find any indication in the statute that the financial condition of the utility is relevant in determining whether property may be included in rate base.
Power, at 434.
Thus, RCW 80.04.250 permits the WUTC to determine, for ratemaking purposes, the fair value of property which is employed for service and capable of being put to use for service. An uncompleted or abandoned utility plant is neither employed for service nor capable of being put to use for service, and is, therefore, not used and useful for service as required by RCW 80.04.250. See Power, at 430. RCW 80.04.250 prohibits the WUTC from including Puget Power's investment in Pebble Springs in the rate base.
Apparently cognizant of the used and useful requirements for rate base treatment, the WUTC rejected Puget Power's request for such treatment. The WUTC, nonetheless, included the investment costs in rates by permitting Puget Power to expense the loss over a period of 10 years without inclusion of the unamortized balances in the rate base. In essence, the WUTC allowed Puget Power to recover these investment costs by including its rates for the *831 next 10 years as an operating expense item.
The majority agrees with the WUTC and holds that capital invested in a nuclear power plant that will never be completed is an "operating expense". How can that be? One is given the distinct impression that this conclusion is reached more on the basis of a process of elimination than after a thorough examination of the statutory scheme. Rate base is no longer an available avenue after Power. So the majority focuses on the operating expense aspect of the formula based on two arguments. First, the WUTC said it was an operating expense and the WUTC's decision should be given deference. Second, it would be unfair for the investors to lose the capital they had invested in Pebble Springs since the purpose of the investment was to provide ratepayers with electric service. I have previously addressed the first argument and found that deference is due the agency's decision only after a determination that the agency's decision was within its statutory authority. I, therefore, turn to an analysis of the statutory authority and then turn to an analysis of the policy considerations addressed by the majority.
Washington is not one of the states to have delegated authority to regulating agencies with no more instruction than to determine what is just and reasonable. Majority, at 808. The student note cited by the majority for this proposition lists numerous state statutory schemes which do not set out guidelines for the determination of gross revenues, base rate, rate of return and operating expenses. See Note, Consumers' Counsel v. Public Utilities Commission: Who Shall Bear the Cost of Abandonment, 11 Cap. U.L. Rev. 91, 96 n. 28 (1981). Washington's statutes, set out above, require not only that the WUTC is to set just, fair, reasonable and sufficient rates, RCW 80.28.010-.020, but, also, that the rates must be for service rendered or to be rendered in connection therewith, RCW 80.28.010, and that for ratemaking purposes only property used and useful for service shall be considered, RCW 80.04.250. The WUTC's powers are limited under Washington's scheme.
*832 The majority asserts that RCW 80.04.250, which allows the WUTC to value only property "used and useful" for public service for ratemaking purposes, applies only to the computation of the rate base. The majority asserts that RCW 80.04.250 is a rate base statute because valuation involves rate bases and expenses are "determined" rather than valued. This is contrary to the clear language of the statute. The statute refers to "rate making", not to computation of the rate base. RCW 80.04.250 specifically states that it applies "whenever [the WUTC] shall deem such valuation or determination [of fair value for ratemaking purposes] necessary or proper under any ... provisions of this title." (Italics mine.) While most cases applying this statute have been cases in which the rate base has been computed, none of these cases have excluded use for purposes of operating expense determination, but only reviewed the Commission's particular valuation for rate base. See, e.g., State ex rel. Pac. Power & Light Co. v. Department of Pub. Works, 143 Wash. 67, 254 P. 839 (1927); State ex rel. Spokane v. Kuykendall, 119 Wash. 107, 205 P. 3 (1922); State ex rel. Pac. Tel. & Tel. Co. v. Department of Pub. Serv., 19 Wn.2d 200, 142 P.2d 498 (1943). Here, where the WUTC is attempting to include a capital investment in operating expenses, it must first value such investment. Therefore, for "ratemaking" purposes, for "valuation or determination" of the investment, RCW 80.04.250 applies. Under the "used and useful" restriction of this statute, the WUTC is barred from including the cost of an abandoned project in the ratemaking formula as an operating expense.
In contrast to the majority, I find that two cases from other jurisdictions are on point in this regard. I find persuasive the reasoning of the opinions of two courts of highest jurisdiction which have addressed the precise issue before this court. Both Pacific Power & Light Co. v. Public Serv. Comm'n, 677 P.2d 799 (Wyo. 1984) and Office of Consumers' Counsel v. Public Utils. Comm'n, 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), appeal dismissed sub nom. *833 Cleveland Elec. Illuminating Co. v. Office of Consumers' Counsel, 455 U.S. 914 (1982) hold that an investment incurred in construction or intended construction of nuclear power plants cannot be classified as an operating expense where, but for abandonment, such investment would have qualified as "used and useful" for inclusion in the rate base.
In Consumers' Counsel, the utility commission contended that a prudent expenditure by a utility could be considered a cost of rendering service if it failed in fact to achieve its purpose so long as the expense was reasonably calculated to provide future utility service at a reasonable cost. The underpinnings of the commission's argument were found in the Ohio statutory provisions that require utilities to provide for future service. Consumers' Counsel, at 163. The Supreme Court of Ohio specifically rejected this argument.
Notwithstanding the provisions that impose a duty on utility companies to plan for the future, the question under R.C. 4909.15(A)(4) remains whether the cancelled plant expenditures represent "[t]he cost to the utility of rendering the public utility service for the test period." Test period considerations aside, what the company sought and what the commission granted was the amortization as service-related costs of an investment that never provided any service whatsoever to the utility's customers.
We seriously question whether the General Assembly contemplated that the commission would treat the type of expenditures controverted herein as costs under R.C. 4909.15(A)(4). The now terminated nuclear plants represented a major capital investment that ultimately would have been included in the rate base under R.C. 4909.15(A)(1), had the projects not been cancelled. It is our opinion that R.C. 4909.15(A)(4) is designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period. A non-exhaustive list of such expenses would include reasonable expenditures for repairs, maintenance, personnel-related costs, administrative expenses, and taxes.
The extraordinary loss sustained by CEI in connection with the terminated nuclear plants cannot be transformed *834 into an ordinary operating expense pursuant to R.C. 4909.15(A)(4) by commission fiat. The commission's statement that "[c]ancellation does not create a past loss, but gives rise to a current cost" is unpersuasive. Under this rationale we question whether there could ever be a "past loss" the return of which would not be recoverable in future ratemaking proceedings notwithstanding the commission's assertion to the contrary. The commission's characterization of the investment in the four terminated plants as "cost" under R.C. 4909.15(A)(4) in light of what we perceive to be the legislative intention underlying that section is unreasonable. Therefore, to the extent that the commission's order in regard to the cancelled plants is predicated on R.C. 4909.15(A)(4), the order cannot stand.
(Footnote omitted.) Consumers' Counsel, at 163-64. Accord, Note, Consumers' Counsel v. Public Utilities Commission: Who Shall Bear the Cost of Abandonment, 11 Cap. U.L. Rev. 91, 96 n. 28 (1981).
The Supreme Court of Wyoming, employing similar reasoning, rejected the contention that abandoned plant costs were operating expenses:
We cannot accept the investment, expenses, and obligations incurred in construction, or intended construction of property which would normally qualify as "used and useful" for inclusion in a rate base as an operating expense. An operating expense includes:
"In general, various particular expenses of a public utility are properly chargeable to expense of operation, including any legitimate expense contributing to the better management or greater efficiency of the utility, a reduction of its investment, or an increase in its operating return. * * *" 73B C.J.S. Public Utilities, § 36, p. 234.
Unified systems of accounts prescribed by most regulatory agencies usually specify that considered as operating expenses, i.e. taxes, advertising, salaries, commodity purchases and similar items....
In contending that the charges were "operating expenses," PP & L [Pacific Power and Light Company] argues that a reasonable and prudent test should be allowed. We need not consider this test insofar as it applies to "operating expenses" since these charges were *835 not "operating expenses" as that term is generally considered.
It is probable that PP & L would not contend these expenses to be "operating" ones if the projects were completed. PP & L would then own a percentage of property; and it would expect to have the costs of the project included in the amount attributed to its "used and useful" property in establishing a rate base.
Pacific Power, 677 P.2d at 805-06.
As did the Wyoming court, we seek a definition of "operating expenses". The WUTC is not given unbridled discretion, but must work under delegated statutory authority. It is our function to interpret the statute under which the agency makes factual findings and sets policy. Where no statutory definition is available we generally turn to common usage. As did the Wyoming court, we would find that according to the common usage as set forth in Corpus Juris Secundum (73B C.J.S. Public Utilities § 36, at 234), these costs are not "operating expenses".
I take exception to the majority's citation to cases which it claims have "allowed utilities to recover abandoned plant costs, prudently incurred, as operating expenses or as expenses which could otherwise be amortized." Majority, at 820 & n. 51. In six of the cases, the inclusion of costs as operating expenses or as an amortized item was not directly considered and it is not apparent whether such inclusion was challenged. See Washington Metro Area Transit Auth. v. Public Serv. Comm'n, 486 A.2d 682 (D.C. 1984); Consumer Protec. Bd. v. Public Serv. Comm'n, 97 A.D.2d 320, 471 N.Y.S.2d 332 (1983); South Dakota Pub. Utils. Comm'n v. Federal Energy Regulatory Comm'n, 690 F.2d 674 (8th Cir.1982); Wisconsin Pub. Serv. Corp. v. Public Serv. Comm'n, 109 Wis.2d 256, 325 N.W.2d 867 (1982); NEPCO Mun. Rate Comm. v. Federal Energy Regulatory Comm'n, 668 F.2d 1327 (D.C. Cir.1981); Central Me. Power Co. v. Public Utils. Comm'n, 433 A.2d 331 (Me. 1981). Three of the cases are based on statutes with no guidance on ratemaking except "just and reasonable" or as "public interest so requires". South Dakota Pub. Utils. Comm'n v. *836 Federal Energy Regulatory Comm'n, supra; NEPCO Mun. Rate Comm. v. Federal Energy Regulatory Comm'n, supra (16 U.S.C. § 825l(b) (1983)); Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414 (1983) (Mass. Gen. Laws Ann. ch. 164, § 94 (West 1976)). Finally, one case does not allow inclusion of the costs as either operating expenses or as an amortized item, but allows the costs to be considered in the rate base. Gulf Power Co. v. Cresse, 410 So.2d 492 (Fla. 1982).
In addition, I take exception to the majority's discussion of various states' statutes. Majority, at 821. The Wyoming and Indiana statutes are very similar to Washington's statutory scheme and those states' denial of recovery of the costs of abandoned facilities is very relevant. See Pacific Power & Light Co. v. Public Serv. Comm'n, supra (Wyo. Stat. §§ 37-2-119, 37-2-122(a) (1977)); Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co., 472 N.E.2d 938 (Ind. Ct. App. 1984) (Ind. Code Ann. § 8-1-2-4 [54-201] (Burns Supp. 1985); Ind. Code Ann. § 8-1-2-6 [54-203] (Burns 1982)). It should also be noted that "`the overwhelming weight of authority from other jurisdictions ...'" referred to on page 821 of the majority, consists of regulatory commission rulings and not court rulings. Consumers' Counsel, 67 Ohio St.2d at 162.
The folly of forcing the costs of an abandoned project into a prenuclear-age formula is apparent in the somewhat strained analysis of the formula. First, even if the costs were an expense it was an expense incurred over a period of 6 years, 1976 through 1982. The formula for required revenue is based on a "test year" or "test period" and is used as the basis for a historical study, relevant only to determine the adequacy for operating costs in future years. Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co., supra. The period involved here is clearly not what is intended to be a test period and insertion of these costs into this part of the formula does not serve as a guide to future expenses. It serves only to indicate how much must be charged to pay back the investors. Costs of an abandoned *837 plant, invested over a 6-year period simply do not serve the function of operating expenses incurred during a "test year". These costs have no function in predicting future expenses.
Second, excluding these costs as expenses or disallowing any actual expense does not, as the majority asserts, result in a reduction of the actual rate of return earned by the shareholders of the utility. See majority, at 811. The rate of return is determined entirely independent of the operating expenses. Otherwise there would be a decrease in shareholder recovery on investments currently devoted to the public service. Exclusion or disallowance of expenses actually results in a loss to the shareholders, offsetting their recovery as determined by multiplying the rate base and the rate of recovery factors. Classification of these costs as operating expenses does not work under the formula used to compute allowable revenue. If these plants had been completed, these expenses would have been considered investment capital and included in the rate base. Investors, therefore, would have received a return on those investments. However, because the investments were unsuccessful, the utility now wishes to classify them as "operating expenses". It is not clear to me how the failure of an investment converts it from part of the rate base to an operating expense. Such a result allows investors to benefit from their investment without risking any loss. Pacific Power & Light Co. v. Public Serv. Comm'n, 677 P.2d 799, 805 (Wyo. 1984); Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co., 472 N.E.2d at 946-47; Office of Consumers' Counsel v. Public Utils. Comm'n, 67 Ohio St.2d 153, 164, 423 N.E.2d 820 (1981), appeal dismissed sub nom. Cleveland Elec. Illuminating Co. v. Office of Consumers' Counsel, 455 U.S. 914 (1982). In addition, it allows utilities to classify as current expenses investments that were made over the last 6 years, which, as previously discussed, is a result not intended under the "test year" analysis.
The weight of authority simply does not support the *838 majority's position. There is fair support for inclusion of these costs as an operating expense among utility commissions, but even this support is not unanimous. Most courts which have considered this issue directly have concluded that investments in abandoned facilities are not operating expenses and are not to be included in ratemaking. See Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co., supra; Pacific Power & Light Co. v. Public Serv. Comm'n, supra; In re Pub. Serv. Co., 125 N.H. 46, 480 A.2d 20 (1984); Office of Consumers' Counsel v. Public Utils. Comm'n, supra. The exceptions are the Massachusetts and the federal courts, both of which are interpreting very general statutes which do not restrict rates, as does our statutory scheme, to charges for "services rendered or to be rendered" or for "used and useful" property. See Mass. Gen. Laws Ann. ch. 164, § 94 (West 1976) and 16 U.S.C. § 825l(b) (1983).
I next turn to the policy considerations which serve as the primary basis for the majority's decision. The crux of the opinions of the WUTC and the majority is that inclusion of abandonment costs in rates is an appropriate regulatory response to Puget Power's financial problems brought about by unprecedented construction programs and subsequent changes in consumer demand and attitudes. The gloomy scenario of Puget Power's financial integrity does not, however, imbue the WUTC or this court with the authority to rewrite the statutes. See People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n, 101 Wn.2d 425, 679 P.2d 922 (1984).
The financial circumstances justifying the WUTC's decision to apportion the Pebble Springs loss between investors and ratepayers simply are not relevant to a determination of appropriate operating expenses. Under Washington ratemaking provisions, ratepayers are not chargeable for utility investments that are neither included in the rate base nor properly categorized as costs of providing service.
This court is fully aware that Puget Power's obligation to serve restricts its activities to a degree not experienced by *839 nonregulated entities. In return, however, investors in Puget Power experience certain advantages which makes their investment less risky than most investments in nonregulated entities. Puget Power is allowed to provide service from a monopoly position and is guaranteed reasonable compensation for the service rendered. Allowance of recovery for a failed venture would improperly expand the monopoly advantage to a point where the investment would become subject to very little or no risk. Under the position adopted by the majority, the only way the investor would fail to recover his investment is if the project both failed and was imprudent. There is nothing in the statutory provisions governing rate determinations which supports the position that the Legislature intended the utility investor's risk should be limited to this degree.
The intent for including the "used and useful" limitation in RCW 80.04.250 is to avoid requiring ratepayers to compensate utilities for investments in property which do not benefit the consumers. Operating expenses are part of the ratemaking formula and necessarily must be incident to the costs of rendering service which is used and useful. Puget Power should not be allowed to circumvent this basic intent by simply declaring that the loss will not receive rate base treatment.
It is the investors who, through shareholder elections, control management decisions. Allowing recovery of unsuccessful investments from the ratepayers encourages inefficiency. The utility cannot lose when it takes risks. While the investments must be prudent, that does not assure that the investments hold the best possibility of success. More risky investments usually hold the possibility of greater returns for the investor. Unrestrained by the possibility of investment loss, what prudent manager would choose the less profitable course of action? Those most responsible for managerial decisions must remain "touched" by those decisions.
The majority engrafts upon the statutory ratemaking scheme an exception that would allow utility companies to *840 recover their investment in unfinished projects ineligible for rate base treatment if the original decision to build the facilities and the subsequent decision to cancel the projects are prudent under the circumstances. In so doing the majority allows the WUTC to exceed its statutory mandate. I would hold that the WUTC exceeded its statutory authority when it approved amortization of Puget Power's investment in the terminated Pebble Springs power project.
It is clear that the WUTC could not simply increase the rate of return for the purpose of producing the same revenue over the same period of time that might be produced if the investment were amortized as an expense. This would merely be a recovery of investment by less direct means than expense or rate base treatment.
I cannot determine on the present record, however, the extent, if any, to which the lost investment may justify an increase in the rate of return for the purpose of attracting new capital. It is easy to argue that any increase in the rate of return will allow at least partial recovery of lost investment. But it does not follow from this alone that the statute precludes such a result if it is necessary to attract such investments as the WUTC may find to be required in the future. I would not attempt in the abstract to draw the line between an increase in rate of return that produces an indirect and impermissible recovery on the one hand, and one that is arguably necessary to attract investment essential to future operations, on the other. The difficulty of drawing this distinction is illustrated by the contrast between the majority and dissenting opinions in Consumers' Counsel v. Public Utils. Comm'n, 4 Ohio St.3d 111, 447 N.E.2d 749 (1983). Indeed, the parties have not even raised the issue whether such a distinction is permissible under our statute. I would, therefore, leave open the extent, if any, to which the rate of return may be increased to reflect the risk that the statute places on investors when a plant is abandoned.
Finally, such a result would not be confiscatory. In Bluefield Water Works & Imp. Co. v. Public Serv. Comm'n, 262 *841 U.S. 679, 67 L.Ed. 1176, 43 S.Ct. 675 (1923), the United States Supreme Court indicated at what point utility rates would be considered unconstitutionally confiscatory:
A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties[.]
Bluefield, at 692. The constitution further requires that the return allowed a utility be
reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.
Bluefield, at 693. Rates which fail to meet these standards "are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment." Bluefield, at 690. See also FPC v. Hope Natural Gas Co., 320 U.S. 591, 88 L.Ed. 333, 64 S.Ct. 281 (1944); State ex rel. Pac. Tel. & Tel. Co. v. Department of Pub. Serv., 19 Wn.2d 200, 266-67, 142 P.2d 498 (1943).
The underlying premise of the constitutional guaranty of just and reasonable fair return on investment is that the capital investment is dedicated to public use. Transcontinental Gas Pipe Line Corp. v. FPC, 518 F.2d 459, 464 (D.C. Cir.1975). See also Permian Basin Area Rate Cases, 390 U.S. 747, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968).
In Tennessee Gas Pipeline Co. v. Federal Energy Regulatory Comm'n, 606 F.2d 1094, 1109 (D.C. Cir.1979), cert. denied, 445 U.S. 920 (1980), the court confirmed the viability of the used and useful standard in determining the reasonableness of rates:
In Smyth v. Ames, [169 U.S. 466, 42 L.Ed. 819, 18 S.Ct. 418 (1898)] the Supreme Court articulated the guiding principle that "the basis of all calculations as to the reasonableness *842 of rates to be charged by a [public utility] must be the fair value of the property being used by it for the convenience of the public." Although methods for determining values of rate base items have evolved since Smyth v. Ames, the precept endures that an item may be included in a rate base only when it is "used and useful" in providing service. In other words, current ratepayers should bear only legitimate costs of providing service to them.
(Footnotes omitted.)
In Market St. Ry. v. Railroad Comm'n, 324 U.S. 548, 89 L.Ed. 1171, 65 S.Ct. 770 (1945), the Court recognized that the company's investments were prudent, but since they no longer had value the utility had no constitutional right to an opportunity to earn a return on them:
Without analyzing rate cases in detail, it may be safely generalized that the due process clause never has been held by this Court to require a commission to fix rates on the present reproduction value of something no one would presently want to reproduce, or on the historical valuation of a property whose history and current financial statements showed the value no longer to exist, or on an investment after it has vanished, even if once prudently made, or to maintain the credit of a concern whose securities already are impaired. The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces.

(Italics mine.) Market St. Ry., at 567.
In FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 590, 86 L.Ed. 1037, 62 S.Ct. 736 (1942), the Court clarified the constitutional requirement to serve the investors' interest:
But regulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future earnings by the device of capitalizing the losses and adding them to the rate base on which a fair return and depreciation allowance is to be earned.... [T]he hazard that the property will not earn a profit remains on the company in the case of a regulated, as well as an unregulated, business.
*843 (Citations omitted.)
In Dayton Power & Light Co. v. Public Utils. Comm'n, 4 Ohio St.3d 91, 447 N.E.2d 733 (1983), the Supreme Court of Ohio was urged to overturn its decision in Office of Consumers' Counsel v. Public Utils. Comm'n, 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), appeal dismissed sub nom. Cleveland Elec. Illuminating Co. v. Office of Consumers' Counsel, 455 U.S. 914 (1982) on the grounds that exclusion of the costs associated with abandoned nuclear power plants from a utility's cost of service is an unconstitutional deprivation of property. The court rejected this contention, restating its analysis in Consumers' Counsel that investors are not entitled to a return of an investment that provides no service. Summarizing, the court holds:
[T]he General Assembly has adopted a consistent position in balancing investor and consumer interests in utility ratemaking. Pursuant to the statutory ratemaking formula investors are assured a fair and reasonable return on property that is determined to be used and useful, R.C. 4909.15(A)(2), plus the return of costs incurred in rendering the public service, R.C. 4909.15(A)(4), while consumers may not be charged "for utility investments and expenditures that are neither included in the rate base nor properly categorized as costs." We see no constitutional infirmity in the balance thus struck by the General Assembly.
(Footnote omitted.) Dayton Power, at 103. Accord, Cleveland Elec. Illuminating Co. v. Public Utils. Comm'n, 4 Ohio St.3d 107, 447 N.E.2d 746, appeal dismissed for want of a substantial federal question, 464 U.S. 802 (1983).
Applying the fundamental constitutional standard to the present case, the Pebble Springs project never has and never will be devoted to public service, employed for the public convenience or used and useful for service. Therefore, Puget Power's investment in it is not subject to constitutional protection.
I would find that the exclusion from rate determination of the investment in Pebble Springs is not an unconstitutional deprivation of property. Per se confiscation in a utility *844 rate case may exist as an abstract premise, but the constitutional cases make it clear that a successful challenge must demonstrate that that rate order, when viewed in its entirety, falls outside the "broad zone of reasonableness." Permian Basin Area Rate Cases, 390 U.S. 747, 770, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968). The heavy burden of establishing unreasonableness must be borne by the challenger. FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 88 L.Ed. 333, 64 S.Ct. 281 (1944).
Respondents cannot presently contend that Puget Power is not receiving a just, reasonable and sufficient return on property that is dedicated to public use. For the reasons stated, I dissent.
DORE, PEARSON, and GOODLOE, JJ., concur with BRACHTENBACH, J.
Reconsideration denied February 24, 1986.
NOTES
[1] Federal Power Commission, The 1970 National Power Survey, Pt. 1 I-1-1 (1971).
[2] RCW 80.50.010; Laws of 1970, 1st Ex. Sess., ch. 45, § 1, p. 313.
[3] 123 Cong. Rec. 11,482 (1977).
[4] See Sommers, Recovery of Electric Utility Losses From Abandoned Construction Projects, 8 Wm. Mitchell L. Rev. 363, 364 (1982); Avery, The Costs of Nuclear Accidents and Abandonments in Rate Making, Pub. Util. Fort., Nov. 8, 1979, at 17-18.
[5] 10 Energy Users Rep. (BNA) 900 (Sept. 2, 1982).
[6] 10 Energy Users Rep. (BNA) 271-72 (Mar. 18, 1982).
[7] Cause U-82-38, Third Supplemental Order (Order), at 19.
[8] Order, at 20.
[9] Order, at 20.
[10] Order, at 35.
[11] See RCW 34.04.133.
[12] Re Boston Edison Co., 46 Pub. Util. Rep. 4th 431, 453 (Mass. Dep't of Pub. Utils. 1982).
[13] Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414 (1983).
[14] Boston Edison, at 453.
[15] Driscoll v. Edison Light & Power Co., 307 U.S. 104, 122, 83 L.Ed. 1134, 59 S.Ct. 715 (1939) (Frankfurter, J., concurring).
[16] 64 Am.Jur.2d Public Utilities § 88 (1972); 73B C.J.S. Public Utilities §§ 12-15 (1983).
[17] Pacific Coast Elevator Co. v. Department of Pub. Works, 130 Wash. 620, 641, 228 P. 1022 (1924); 64 Am.Jur.2d Public Utilities § 89; 73B C.J.S. Public Utilities § 12(a).
[18] Port Orchard v. Kitsap Cy., 19 Wn.2d 59, 61, 141 P.2d 150 (1943); 64 Am.Jur.2d Public Utilities § 89; Interstate Commerce Comm'n v. Cincinnati, N.O. & T.P. Ry., 167 U.S. 479, 499, 42 L.Ed. 243, 17 S.Ct. 896 (1890).
[19] See Raymond Lumber Co. v. Raymond Light & Water Co., 92 Wash. 330, 335, 159 P. 133 (1916); RCW 80.01.040.
[20] See Note, Consumers' Counsel v. Public Utilities Commission: Who Shall Bear the Cost of Abandonment, 11 Cap. U.L. Rev. 91, 96 (1981).
[21] State ex rel. Puget Sound Power & Light Co. v. Department of Pub. Works, 179 Wash. 461, 466, 38 P.2d 350 (1934).
[22] E. Gellhorn & R. Pierce, Jr., Regulated Industries 97 (1982); R. Pierce, G. Allison & P. Martin, Economic Regulation: Energy, Transportation and Utilities 130 (1980); W. Jones, Regulated Industries 128-29 (2d ed. 1976); D. Boies & P. Verkuil, Public Control of Business 112-13 (1977); 1 A. Priest, Public Utility Regulation 45 (1969). See Third Supplemental Order (cause U-82-38), at 6, 7.
[23] E. Gellhorn & R. Pierce, Jr., at 97-98.
[24] People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n, 101 Wn.2d 425, 427, 679 P.2d 922 (1984); A. Priest, at 139.
[25] People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n, supra; A. Priest, at 45.
[26] E. Gellhorn & R. Pierce, Jr., at 99; A. Priest, at 191-93.
[27] 64 Am.Jur.2d Public Utilities § 173; 73B C.J.S. Public Utilities § 36(a); A. Priest, at 45.
[28] State ex rel. Pac. Tel. & Tel. Co. v. Department of Pub. Serv., 19 Wn.2d 200, 252-60, 142 P.2d 498 (1943); West Ohio Gas Co. v. Public Utils. Comm'n, 294 U.S. 63, 79 L.Ed. 761, 55 S.Ct. 316 (1935). See also Chicago & Grand Trunk Ry. v. Wellman, 143 U.S. 339, 345-46, 36 L.Ed. 176, 12 S.Ct. 400 (1892).
[29] WAC 480-100-031.
[30] E. Gellhorn & R. Pierce, Jr., at 145; A. Priest, at 47.
[31] Northern Pac. Transp. Co. v. State Utils. & Transp. Comm'n, 69 Wn.2d 472, 477-78, 418 P.2d 735 (1966).
[32] Jewell v. State Utils. & Transp. Comm'n, 90 Wn.2d 775, 776, 585 P.2d 1167 (1978).
[33] E. Gellhorn & R. Pierce, Jr., at 167.
[34] Pacific Telephone, at 217-26.
[35] See Georgia R.R. & Banking Co. v. Smith, 128 U.S. 174, 179, 32 L.Ed. 377, 9 S.Ct. 47 (1888). See also RCW 34.04.130(6)(a).
[36] 64 Am.Jur.2d Public Utilities § 139 (1972); 73B C.J.S. Public Utilities § 24 (1983).
[37] See Pacific Power & Light Co. v. Public Serv. Comm'n, 677 P.2d 799 (Wyo. 1984); Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co., 472 N.E.2d 938 (Ind. Ct. App. 1984) cited by petitioners.
[38] See, e.g., State ex rel. Pac. Power & Light Co. v. Department of Pub. Works, 143 Wash. 67, 82, 254 P. 839 (1927); State ex rel. Spokane v. Kuykendall, 119 Wash. 107, 116, 205 P. 3 (1922); State ex rel. Pac. Tel. & Tel. Co. v. Department of Pub. Serv., 19 Wn.2d 200, 232, 142 P.2d 498 (1943). See also Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414, 424-25 (1983); Cohen v. Pennsylvania Pub. Util. Comm'n, 90 Pa. Commw. 98, 494 A.2d 58, 62-63 (1985).
[39] See 64 Am.Jur.2d Public Utilities § 138 (1972); 73B C.J.S. Public Utilities § 23 (1983).
[40] Laws of 1911, ch. 117, § 92, p. 601; Pacific Telephone, at 233.
[41] See J. Garfield & W. Lovejoy, Public Utility Economics 56 (1964); 1 A. Priest, Public Utility Regulation 139 (1969).
[42] See F. Welch, Public Utility Regulation 317 (2d ed. 1968); A. Priest, at 46.
[43] See F. Welch, at 268; WAC 480-100-031.
[44] See 64 Am.Jur.2d Public Utilities §§ 173-88 (1972); 73B C.J.S. Public Utilities §§ 36, 37 (1983).
[45] RCW 34.04.130; Pacific Telephone.
[46] Cause U-82-38, Third Supplemental Order, at 3, 4.
[47] Order, at 35.
[48] FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 88 L.Ed. 333, 64 S.Ct. 281 (1944).
[49] See Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414, 422-24 (1983); Note, Consumers' Counsel v. Public Utilities Commission: Who Shall Bear the Cost of Abandonment, 11 Cap. U.L. Rev. 91, 94, 108 (1981); Sommers, Recovery of Electric Utility Losses From Abandoned Construction Projects, 8 Wm. Mitchell L. Rev. 363, 371 (1982) and citations to regulatory decisions therein footnoted.
[50] Re Boston Edison Co., 46 Pub. Util. Rep. 4th 431, 459 (Mass. Dep't of Pub. Utils. 1982). See Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414, 420 (1983).
[51] Gulf Power Co. v. Cresse, 410 So.2d 492, 493 (Fla. 1982); Central Me. Power Co. v. Public Utils. Comm'n, 433 A.2d 331, 344-45 (Me. 1981); Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 455 N.E.2d 414, 425-27 (1983); Consumer Protec. Bd. v. Public Serv. Comm'n, 97 A.D.2d 320, 471 N.Y.S.2d 332, 335-36 (1983); Wisconsin Pub. Serv. Corp. v. Public Serv. Comm'n, 109 Wis.2d 256, 325 N.W.2d 867, 870-71 (1982); South Dakota Pub. Utils. Comm'n v. Federal Energy Regulatory Comm'n, 690 F.2d 674, 676-78 (8th Cir.1982); NEPCO Mun. Rate Comm. v. Federal Energy Regulatory Comm'n, 668 F.2d 1327, 1332 (D.C. Cir.1981); Union Elec. Co. v. Federal Energy Regulatory Comm'n, 668 F.2d 389, 397-98 (8th Cir.1981); Washington Metro Area Transit Auth. v. Public Serv. Comm'n, 486 A.2d 682, 687-88 (D.C. 1984); State ex rel. Union Elec. Co. v. Public Serv. Comm'n, 687 S.W.2d 162, 165-68 (Mo. 1985); Abrams v. Public Serv. Comm'n, 104 A.D.2d 135, 483 N.Y.S.2d 785 (1984); Cohen v. Pennsylvania Pub. Util. Comm'n, 90 Pa. Commw. 98, 494 A.2d 58, 62 (1985).
[52] Pacific Power & Light Co. v. Public Serv. Comm'n, 677 P.2d 799 (Wyo. 1984).
[53] Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co., 472 N.E.2d 938 (Ind. Ct. App. 1984).
[54] See footnote 37.
[55] Office of Consumers' Counsel v. Public Utils. Comm'n, 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), appeal dismissed sub nom. Cleveland Elec. Illuminating Co. v. Office of Consumers' Counsel, 455 U.S. 914, 71 L.Ed.2d 455, 102 S.Ct. 1267 (1982).
[56] In re Pub. Serv. Co., 125 N.H. 46, 480 A.2d 20 (1984).
[57] N.H. Rev. Stat. Ann. § 378:30-a (Supp. 1981) (part).
[58] Office of Consumers' Counsel, 67 Ohio St.2d at 162.
[59] In re Pub. Serv. Co., at 56.
[60] Order, at 35.
[61] State ex rel. Hotel Continental v. Burton, 334 S.W.2d 75, 80 (Mo. 1960).
[62] RCW 80.28.010; RCW 80.28.110. See State ex rel. PUD 1 v. Schwab, 40 Wn.2d 814, 823, 246 P.2d 1081 (1952).
[63] See Port Orchard v. Kitsap Cy., 19 Wn.2d 59, 61, 141 P.2d 150 (1943); Northern Pac. Transp. Co. v. State Utils. & Transp. Comm'n, 69 Wn.2d 472, 477-79, 418 P.2d 735 (1966).
[64] See Permian Basin Area Rate Cases, 390 U.S. 747, 791-92, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968); RCW 34.04.130(6).
[65] See Herrett Trucking Co. v. State Pub. Serv. Comm'n, 58 Wn.2d 542, 543-45, 364 P.2d 505 (1961).
[66] At all pertinent times herein, RCW 80.28.010 read as follows:

"Duties as to rates, services, and facilities. All charges made, demanded or received by any gas company, electrical company or water company for gas, electricity or water, or for any service rendered or to be rendered in connection therewith, shall be just, fair, reasonable and sufficient.
"Every gas company, electrical company and water company shall furnish and supply such service, instrumentalities and facilities as shall be safe, adequate and efficient, and in all respects just and reasonable.
"All rules and regulations issued by any gas company, electrical company or water company, affecting or pertaining to the sale or distribution of its product, shall be just and reasonable.
"Every gas company, electrical company and water company shall construct and maintain such facilities in connection with the manufacture and distribution of its product as will be efficient and safe to its employees and the public." (Italics ours.)
"Commission to fix just, reasonable, and compensatory rates. Whenever the commission shall find, after a hearing had upon its own motion, or upon complaint, that the rates or charges demanded, exacted, charged or collected by any gas company, electrical company or water company, for gas, electricity or water, or in connection therewith, or that the rules, regulations, practices or contracts affecting such rates or charges are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in any wise in violation of the provisions of the law, or that such rates or charges are insufficient to yield a reasonable compensation for the service rendered, the commission shall determine the just, reasonable, or sufficient rates, charges, regulations, practices or contracts to be thereafter observed and in force, and shall fix the same by order." (Italics ours.) RCW 80.28.020.
[67] State ex rel. Longview Fire Fighters Local 828 v. Longview, 65 Wn.2d 568, 570-71, 399 P.2d 1 (1965).
[68] Griffin v. Department of Social & Health Servs., 91 Wn.2d 616, 624, 590 P.2d 816 (1979).
[69] See King Cy. v. Seattle, 70 Wn.2d 988, 991, 425 P.2d 887 (1967).